RALEIGH MANUFACTURERS, INC.,
ET AL. *v.* CANTELA

[No. 38, September Term, 1969.]

*Decided November 10, 1969.*

The cause was argued before HAMMOND, C. J., and BARNES, MCWILLIAMS, SINGLEY and SMITH, JJ.

*R. Roger Drechsler,* with whom was *Robert L. Preller* on the brief, for appellant.

*Marvin L. Frankel,* with whom were *Albert H. Frankel* and *Frankel & Frankel* on the brief, for appellee.

McWilliams, J., delivered the opinion of the Court.

Mrs. Cantela has a pain in her derrière, the result of an accidental injury sustained on 16 October 1964. A jury in the Baltimore City Court, on 19 November 1968, found that as a result of that injury she is "permanently and totally disabled." The effect of the judgment entered thereon was to reverse the decision of the Workmen's Compensation Commission that she had only a "40% industrial loss of use of her body." Before us is the appeal of the employer (Raleigh) and its insurer (Lumbermens).

Mrs. Cantela (claimant) was employed by Raleigh in 1962 to sew labels in men's suits. In June 1963, as the result of a fall not connected with her employment, she broke her left arm. She returned to work with her arm in a cast and since she could not operate the sewing machine she was put to work in the office as a posting clerk. On 16 October 1964, her broken arm having fully healed, she "stooped down" to get a file out of the bottom drawer of her desk and "hit * * * [her] rectum on the filing cabinet which had been moved to the back of" her. Although in pain she continued working. On the following day the injury became so painful she was sent to Bon Secours Hospital for examination and treatment. Sitz baths were advised but she said they gave her only slight and temporary relief. After a few months she went to see Dr. Kfoury, an orthopedic surgeon. He told her she had broken her coccyx; he recommended surgery. The broken fragment was excised in March 1965. After a six week convalescence she went back to her job at Raleigh. On 15 November she had to stop working because her "condition was much worse, * * * [she] couldn't sit at all." In December she came under the care of another orthopedist, Dr. Reahl. Although his injections eased her pain somewhat, he referred her to a Dr. Brager who gave her "ultra-sound" treatments. After that she went daily to the University Hospital where she received digital, transrectal massage of the Levator Ani muscle. In September

1966 she was treated by a proctologist, Dr. Monte Edwards, who, after examination, diagnosed her condition as "levator spasm of [the] Thiele type (coccygodynia)." He continued the levator massage treatments, noting some improvement at times and at times a regression. A little over four months later she stopped going to Dr. Edwards. Thereafter she received medication, spinal injections and "ultra-sound" treatments from other doctors. She continued also with the sitz baths, taking, at times, as many as four during the day and five during the night.

In January 1966 she tried to return to her job at Raleigh but after a day and a half she had to give it up. In the spring of 1966, following a doctor's advice, she sought part-time employment. She said prospective employers laughed at her saying they didn't have any work for her but that they would "get * * * [her] a good lawyer." Shortly thereafter she applied for unemployment compensation and social security benefits.

The significant statement in Dr. Reahl's testimony, more of which will appear later on, and as to which there seems to be no dispute, is as follows:

"Q. What is and I don't know if I have asked you, coccygodynia? A. Frankly, I would like to know myself because I think if we know what the real pathology is, we probably would be able to do more about it. Basically, it's a painful syndrome or group of symptoms about the base of the spine or coccyx which causes pain primarily on sitting and particularly in a slumped position or by putting pressure on the area. It may cause radiation in the buttocks and at times even down into the legs. It's always aggravated by stool, by bowel movements as general pressure. I have often wondered whether the coccyx itself is really the thing at fault in this area because in the amount of ligaments and the nerves and the muscles, I just wonder

if this is an innocent bystander, something that looks like it may be taken out because these people really don't do well after a coccygectomy. In fact, a large majority don't do well at all and my feeling is if this were the true cause, then certainly a high percentage, at least a reasonable percentage of them would be getting better. In fact, this is not true. I have yet to find a patient I would do one on."

He said that in his opinion "she is totally disabled for economic reasons and [she] is not employable;" he felt that her condition is "directly related to the accident she sustained in October of 1964."

As the trial neared conclusion appellants sought to introduce into evidence the claimant's answer to one of their interrogatories. The interrogatory and the answer are as follows:

"13. State the amount reported as earned income in your income tax returns for each of the past five years and the District in which the returns were filed."

"13. Baltimore [District]

| | | | |
|---|---|---|---|
| 1962 Woolworth Co. | | | $1865.13 |
| (Part of year in Florida) | | | |
| 1963 Raleigh Mfg. Co. | | | 2509.32 |
| 1964 " | " | " | 3763.14 |
| 1965 " | " | " | 3021.84" |

The trial judge, Cullen, J., sustained claimant's objection to the admission of both the interrogatory and the answer.

I.

The first of appellants' three contentions has to do with Judge Cullen's refusal to admit into evidence claimant's answer to the interrogatory set forth above. Appellants insist that the purpose of their offer was legitimate. *Bauman v. Woodfield*, 244 Md. 207 (1966), is cited in support of the argument that such evidence is admis-

sible even though the adverse party has already testified so long as there is a legitimate purpose in the use of the questions and answers. But we said much more than that in *Bauman*:

> "Rule 413 a 2 states, in essence, that at the trial or upon the hearing of a motion, any part or all of a deposition of a party, *so far as admissible under the rules of evidence*, may be used *by an adverse party for any purpose.* 'Adverse party' as used in this rule means a party to an action on the opposite side of an issue raised by the pleadings. In this case, the Woodfields, as indicated by the pleadings, were on the opposite side of the Baumans. 'Any purpose' as used in the rule does not mean that the use of the deposition is limited to purposes of impeachment or contradiction. *Billmeyer v. State, Use of Whiteman*, 192 Md. 419, 64 A. 2d 755, *and does not mean that the rules of evidence may be ignored. * * *.* [First and third emphases added.]

> "Under Maryland Rule 413 a 2 defendant may put plaintiff's deposition in evidence as part of the defendant's case, *so far as the deposition is admissible and relevant. * * *.*" (Emphasis added.)

> \* \* \*

> "However, we need not decide for the purpose of this case whether or not the court below committed error in not permitting counsel for the plaintiffs to read plaintiffs' depositions in rebuttal since the plaintiffs called, without objection, Leonard Bauman to testify in his own behalf in rebuttal. *Thus plaintiffs had full opportunity to elicit any testimony to explain, modify or clarify a claimed admission, contradiction or inconsistency in the testimony introduced from the prior depositions.* Under these circumstances the error, if any, was harmless.

Snowhite v. State, Use of Tennant, 243 Md. at
310-11; Maszczenski v. Myers, 212 Md. 346, 129
A. 2d 109." Id. at 219-221. (Emphasis added.)

The record shows that the claimant was produced as a
witness at the trial below, that she was cross-examined
(and re-cross-examined) by appellants at length and in
great detail, and that they "had full opportunity to elicit
any testimony to explain, modify or clarify a claimed ad-
mission, contradiction or inconsistency in the testimony
introduced from" the answer to the interrogatory.

Appellants argue that the jury "should have had be-
fore it specific factual evidence of claimant's substantial
earnings following" the accident which, together with
other things, "would [have] permit[ted] them to evalu-
ate whether it was the industrial accident or lack of de-
sire" which kept her unemployed. We are not impressed.
It is clear from her testimony that she worked for Ra-
leigh all during 1964, except for a few days in October.
In 1965 she worked until she was operated on by Dr.
Kfoury in March. Six weeks later she came back and con-
tinued working until 15 November. Thus the jury was
surely aware of the fact that she had "substantial earn-
ings" following her accident. Indeed counsel pursued this
with some diligence in the cross-examination of the
claimant. Reading her answer to the interrogatory would
not have given the jury any information they did not al-
ready have or which could have been elicited from her.
If Judge Cullen erred in this regard, the error was harm-
less. Bauman, supra; Smith v. State Roads Commission,
240 Md. 525 (1965).

II.

Appellants next complain that Judge Cullen erred
when he instructed the jury that there was "no legally
sufficient evidence" in the case that the claimant, on 16
October 1964, "was suffering from any prior disease
* * * [or that she then had] any permanent impair-
ment due to prior accidents, disease or congenital condi-
tion which was likely to be a hindrance or obstacle to her

employment." It is true, as appellants point out, that, in June 1963, she could not operate the sewing machine because her arm was in a cast and that, as a result, she was put to work in the office as a posting clerk. It is also true that the mending of her broken arm, after Dr. Eaton operated on it, was uneventful and successful. It seems to us only one inference is to be drawn from the fact that, after her recovery, Raleigh did not send her back to the sewing machine to sew on labels; i.e., she was more useful as a posting clerk. The inference is fortified when it is observed that her weekly pay was increased by five dollars when she became a posting clerk. Counsel for the claimant stresses appellants' failure to submit, in the court below, the issue of apportionment, Code, Art. 101, § 36 (7) (1964 Repl. Vol.), citing Rule B43 of the Rules of the Supreme Bench of Baltimore City, which requires the appellee (i.e., Raleigh and Lumbermens) "within thirty days after the record is filed [in the trial court] [to] file his [its] proposed issues and any exceptions to issues proposed by the appellant." Comment in this regard seems unnecessary. *Richardson v. Home Mutual Life Ins. Co.*, 235 Md. 252 (1964). We see no error here.

## III.

Appellants insist it was error for Judge Cullen to allow Dr. Reahl to answer a "hypothetical" question put to him by counsel for the claimant. To discern the lack of merit in this contention it will be necessary for us to set forth, in some detail, the testimony of Dr. Reahl who, it will be observed, is a diplomate of the American Board of Orthopedic Surgeons. He first saw the claimant on 9 December 1965. Relevant excerpts from his testimony follow:

> "A. Patient complains of pains in the base of her spine. The patient states that on 16 October, 1964, while at work, she struck the base of her spine between the buttocks on a metal filing cabinet. She apparently had some bleed-

ing from the rectal area and was seen at Bon Secours Hospital. This bleeding persisted off and on for about four to five days. It was spotting in nature. Because of the persistent pain she subsequently underwent coccygeatomy by Dr. Emile Kfoury on 19 March, 1965. She was discharged ten days later. The patient returned to work in about six weeks and stated that she was feeling better but also stated that she could not sit back. A special stool was then constructed so that she could sit without putting pressure on the base of the coccyx. At the present time the patient must sit on a toilet seat at home in order to get relief from pain. She has tried a foam rubber ring but the flexibility causes an irritation at the base of her spine.

"The patient notes that over the last four weeks the pains have become more intense and she cannot work. She gets some radiation from the coccyx up along the sacral level. The patient has occasional radiation along the posterior part of the thigh and both buttocks. *Past history reveals that the patient fell two years ago and fractured her left wrist.* She denies any other injuries or fractures. [Emphasis added.]

"Physical examination reveals a fifty-five year old white female who is right-handed. Her stated height is five feet four inches and her stated weight is 138 pounds. The patient walks and moves with somewhat guarded motions. She stands in a somewhat flex position. Examination of the back reveals the patient to be tilted somewhat forward. There is some flattening of the normal lordosis which appears to be secondary to voluntary paraspinal guarding. There is a well healed one inch scar to the right of the midline in the sacrum which is said to be the residual of an excision of a mass. In addition, there is a well healed three inch scar over

the sacro-coccygeal area in the midline. There is exquisite tenderness over the base of the sacrum and to a lesser extent as one progresses cephalad. There is no tenderness to direct pressure over the lumbo-sacral area. There is also tenderness over the sacro-tuberous ligaments, particularly on the left.

"Flexion of the lumbar spine is sixty degrees, extension is zero to five degrees, left and right lateral bending is five degrees in each direction. The patient demonstrates some guarding of motions but states that this does not cause pain. Deep tendon reflexes are brisk and equal in the lower extremities. There is no motor or sensory deficit in the lower extremities. There is no perineal hypesthesia. Abduction and internal rotation of the right hip seem to aggravate her pain.

"X-rays were taken of the sacro-coccygeal area. These reveal the absence of the coccyx. In addition, it is noted that the patient has a transitional vertebra at the L5-S1 level with pseudarthrosis formation on the left. There also appears to be some osteoarthritic changes in the lower lumbar vertebra. This patient apparently has symptoms related to the coccyx—"

\* \* \*

"Q. What treatment did you give her, Dr. Reahl? A. Well, I had warned her that I didn't know whether or not this is going to be much value but I told her we should try first an injection of cortisone. This injection gave her some temporary relief but not for long periods of time.

"I then sent her to Dr. Stuart Brager for physical therapy, particularly, ultrasound to this area. This again gave her exaggerated relief, it got a little better and then it went right

back to where she was before. I thought we exhausted all of the treatments.

"Q. Did you have occasion to see her again? A. Yes.

"Q. When was that? A. I saw her—the last time I saw her was May 8th, 1967. I had discharged her originally on the 7th of April, 1966 —excuse me, May, 1966 after she had a flare-up of treatment that she had received from Dr. Brager.

"At that time I felt that she did not show any significant changes and I felt she had little or no chance of improving and I discharged her and felt that whatever disability she had, she had.

"Q. Did you arrive at a conclusion after seeing her on May the 8th, 1967 with reasonable medical certainty as to whether the condition from which Mrs. Cantela was suffering was permanent? A. Yes."

\* \* \*

"Q. Do you have an opinion with reasonable medical certainty as to the extent of that disability, the anatomical disability in terms of percentage? A. Yes.

"Q. What was your opinion? A. I felt that she has thirty per cent permanent partial disability of her back.

"Q. Are you familiar with the type of work and the background of Mrs. Cantela? A. I believe she was a sewing machine operator if I'm not mistaken and her work is primarily secretary which is exactly what she doesn't need, which is exactly what aggravated her condition.

"Q. Now, do you have an opinion with reasonable medical certainty as to what effect this anatomical disability that you expressed would have on her economic situation?

"(Mr. Drechsler) I object. He has assumed an occupation that she has not testified to.

"(The Court) That's true.

"(Mr. Frankel) I would like to make a proffer at this time, Your Honor. I would like to proffer that when Mrs. Cantela is recalled to the stand, she will testify that from 1927 on and off she worked at F. W. Woolworth Company and from 1957 through December 24th of 1962, she worked for F. W. Woolworth Company, Eastern Avenue and operated a luncheonette and from January 23rd, through October 16, 1964, she worked for the Raleigh Manufacturing Company in Baltimore as a sewing machine operator and after a wrist injury in July of 1963, was transferred to office work and that's her work history.

"(The Court) All right. Ask your question in that way.

"(Mr. Drechsler) He has already assumed a different employment from the one she is in.

"(Mr. Frankel) I will ask a hypothetical question.

"(The Court) That's the only way I know of.

"Q. Doctor, I want you to assume the following facts with regard to Mrs. Cantela.

"Assume that she is now fifty-nine years old and that she did not finish the eighth grade, she had no special training and her employment record is as follows: From 1927 on and off she was employed by the F. W. Woolworth Company in Florida and operated a luncheonette. From 1957 through December the 24th, 1962, she was employed by the F. W. Woolworth Company, Eastern Avenue and operated a luncheonette. This work was for approximately sixty hours a week.

"From January the 21st, 1963, through October the 16th, 1964, she was employed by the

Raleigh Manufacturing Company, a company manufacturing men's suits. That originally she was employed as a sewing machine operator, that following a wrist injury in July, 1963, she was transferred to do clerical work which involved bending and stooping and filing and she remained doing that job until her accident on October 16, 1964.

"Do you have an opinion with reasonable medical certainty as to the effects of the anatomical disability that you related on the stand, what effects would that anatomical disability have on her body as a whole, economically or on her employment probabilities?

" (Mr. Drechsler) I object.

"(The Court) I am sure you object for the reason that those facts have not been established.

"(Mr. Drechsler) I don't understand the question because I'm not sure what we are buying at this point. There are so many other material facts.

"(The Court) He is giving a supposed work history that has not been testified to. For convenience, I will let it in, subject to your objection and I will rule on it on the theory of proof of the facts established with the question. I don't know how else to do it."

Counsel for the appellants subjected Dr. Reahl to an assiduous cross-examination, several excerpts from which follow:

"Q. Do you know what type of work she returned to? A. She said she returned to her work. I don't know which specifically she returned to, whether the sewing machine or the clerical work."

\* \* \*

"Q. Do you know what kind of work she was doing during that seven-month period which

was her regular work? A. No, she told me she did operate a sewing machine and after this she had gone back to clerical work. She only told me she had difficulty sitting primarily.

"(The Court) She did tell you she did clerical work?

"(The Witness) She told me she was originally doing sewing machine work. They had put her back to doing clerical work after the operation and I assumed that was what she was doing."

In *Langenfelder v. Thompson*, 179 Md. 502, 507-08 (1941), Judge Delaplaine, for the Court, said:

"A further objection of the appellants was that the questions, which were asked Dr. Wallace, did not contain any hypothesis. The appellants cited *Quimby v. Greenhawk*, 166 Md. 335, 171 A. 59, where the court said that the admissibility of a hypothetical question depends primarily upon whether it furnishes the means of knowing upon what premises the conclusion is based. They also relied on *Mathiesen Alkali Works v. Redden*, 177 Md. 560, 10 A. 2d 699, which held that a hypothetical question must contain every material fact in evidence essential to the formulation of a rational opinion. But in those cases the questions were purely hypothetical. In this case the opinion of the expert was formed from his personal observation. We follow the general rule that when a witness is called to express an opinion based upon personal observation, it is unnecessary to submit to him a hypothetical question before he can express his opinion. [Citing cases.] Where a medical expert is familiar with the facts of an accident and the nature of the injuries, he is competent to testify whether the injuries were caused by the accident, without the necessity of

having the facts in evidence recounted to him before he gives his opinion. *It would be an idle and useless ceremony to require the evidence to be detailed in the form of a hypothetical question where the main facts are undisputed and the expert is entirely familiar with the facts. Furthermore, any details which the expert has personally observed can be elicited either on direct examination or on cross-examination, and these details can be associated with the other grounds for the general conclusion;* and if it is discovered that any essential facts have been overlooked, the weight of his opinion will thereby be weakened or entirely destroyed. The opinion of an expert, the grounds upon which it has been formed, and the weight to be accorded to it are all matters for the consideration of the jury." (Emphasis added.)

Appellants' brief contains the following statement:

"The fact that Dr. Reahl had treated the Claimant, may be argued on her behalf as a reason for allowing his opinion without the need for a hypothetical question. However, the Employer and Insurer submit that by framing such a question and proceeding by that route, the Claimant was bound to phrase the question properly."

Appellants seem to be saying that merely because claimant's counsel incautiously chose to ask a "hypothetical" question, which we think was quite unnecessary and which seems to have been not at all prejudicial, the case should be sent back to be tried again. As Judge Offutt said, for the Court, in *Gordon v. Opalecky*, 152 Md. 536, 549 (1927), "it would be trifling with the law to reverse a judgment in a case which has been fully and fairly tried for so trivial an error."

*Judgment affirmed.*
*Costs to be paid by appellants.*