# DILLON PROPERTIES, INC. *v.* MINMAR
# BUILDERS, INC.

[No. 190, September Term, 1969.]

*Decided March 9, 1970.*

The cause was argued before HAMMOND, C. J., and McWILLIAMS, FINAN, SINGLEY and SMITH, JJ.

*Marvin H. Anderson* for appellant.

*Francis J. Pelland*, with whom were *Sadur, Pelland & Braude* on the brief, for appellee.

FINAN, J., delivered the opinion of the Court.

Plaintiff-appellee, Minmar Builders, Inc., prime contractor (contractor), brought suit against the defendant-appellant (owner) Dillon Properties, Inc., to recover the unpaid balance of its contract price. The agreement dated June 14, 1965, was an American Institute of Architects Standard Form and contained specifications for the construction of a trucking terminal with an asphalt parking lot on three sides of the terminal building at a total price of $113,427. The undisputed unpaid contract balance was $24,124.50. The owner counterclaimed for $14,175, representing the cost of repairing the paved area approximately two and a half years after the work was performed by the contractor. The court, sitting without a jury, after six days of trial during which it heard testimony from sixteen witnesses, entered judgment for the contractor in the amount of $21,087 after first making a deduction in the amount of $3,037.50 which was the amount it allowed on the owner's counterclaim.

The dispute concerned the paving portion of the contract which called for a 6 inch gravel base topped by 2 inches of bituminous concrete. There was testimony that the laying of the base course was almost completed when

on April 8, 1966, Mr. Sprinkle, project manager for the owner's architect, visited the project site at about 3:00 P.M. for the second time that day and expressed his opinion that more work was necessary to properly prepare the subbase. He so informed the subcontractor's foreman. After Mr. Sprinkle left, the paving of the lot was completed. The paving contractor visited the job site the following morning and observed no faulty work.

On Monday, April 11, 1966, Mr. Sprinkle noticed some depressions on the lot appearing like tire tracks from a ten-wheeler, some puddles and what is known in the trade as "cold spots." On his next visit to the job site on April 20, he noticed that a truck had driven over the pavement and disturbed it extensively. He did not know whose truck it was. The only truck of the contractor's which he observed was a pickup truck, whereas the construction of the gasoline pump area and the installation of the tanks in the rear of the building, which were not the responsibility of the contractor, would have involved the use of a crane with a bucket, together with concrete mixing trucks.

During the first week of August, 1966, the Jacobs Transfer Company commenced occupancy of the terminal and has continued use of it since that date. During the winter and spring of 1967-1968 an additional three truck bays were constructed on the rear of the existing terminal building. During the months following the completion of the paving work in April of 1966, numerous cracks, referred to in the industry as "alligatoring," appeared. There was testimony that this could be caused by "cold spots" which occurred in laying the asphalt, by poor compaction of the subgrade and poor drainage. From April, 1966, and extending almost to the date of the trial in the court below, there occurred between the parties an exchange of numerous and varied theories as to the cause of the damage and attendant liabilities. The contractor sought to place the blame on the owner because of its failure to retain in the contract a provision in the original design for construction calling for a pe-

rimeter of drainage tile, the lack of which drainage system the contractor claims contributed to the resulting damage in the parking area. The contractor further contended that the architect ignored its calling to his attention a design deficiency regarding the thickness of the asphalt and the subbase. The owner countered by alleging that the work was performed in a negligent manner and left in a state of incompletion. In the late fall of 1966, the contractor offered to repair the lot to the architect's satisfaction if the owner would turn over to it a payment then due in the amount of $9,271.80, which sum had been certified for payment by the architect on November 8, 1966. However, the owner rejected this in its entirety, insisting that the lot be completely repaired before any more funds were paid to the contractor. At this time the contractor also was willing for the owner to retain more than $15,000 still due, pending the satisfactory completion of the work.

In January of 1966, the contractor obtained an estimate from the Alaska Paving Company on the cost of the necessary corrective work. This estimate was $3,037.50, exclusive of the area for the gasoline pump island which was the owner's responsibility. However, the parties could not get together on this proposition. Thereafter, in December of 1967, the contractor filed this action. In October of 1968, the owner, almost two years after the contractor offered to repair the lot, undertook the repairs that are now the subject of the $14,175 counterclaim. During this two year period the lot was in continuous use. The cost of repairs charged as a counterclaim by the owner does not take into consideration any damage caused by the owner in the installation and later relocation of the gasoline pumps; the damage caused by the movement of construction equipment across the lot for the seven or eight month period that the construction was in progress on the three additional truck bays; or the damages caused by normal wear and tear during the more than two years the lot was in constant use by the trucking company tenant.

The main thrust of the appellant's argument is that the judgment should be reversed and remanded for a new trial because it is based on the misstatement of facts by the court; that the court failed to analyze the evidence; and that it made a number of findings of mixed questions of law and fact in which it misapplied the law. However, as we interpret the brief and argument of the appellant, what it in essence asks this Court to do, is to substitute its evaluation and judgment of the facts for that of the lower court. This, even the appellant recognizes, we cannot do under Maryland Rule 886 a, unless the trial judge was clearly erroneous. *Grain Dealers Mut. Ins. Co. v. Van Buskirk,* 241 Md. 58, 70, 215 A. 2d 467 (1965). Cf. *Greenberg v. Dunn,* 245 Md. 651, 655, 227 A. 2d 242 (1967). Furthermore, the same rule requires that "due regard will be given to the opportunity of the lower court to judge the credibility of the witnesses." *Johnson v. State,* 238 Md. 643, 644, 210 A. 2d 399 (1965). After reviewing some 409 pages of the record extract and numerous exhibits, we do not think that the lower court was clearly erroneous in its analysis of the facts, nor do we think it wrong in its application of the law to the facts.

The basic failure which the owner found with the work performed by the contractor relates to the subbase of the asphalt paving, which it declares was improperly prepared. It is noted that Article 13 of the contract provides, that "if any work should be covered up without approval or consent of the architect, it must, if required by the architect, be uncovered for examination at the contractor's expense." Yet, the evidence is devoid of any demand by the architect at the time the paving was completed or within a reasonable time thereafter, that the contractor uncover any of the asphalt pavement to enable the architect, on behalf of the owner, to determine whether specifications had been followed. There was testimony presented by witnesses for the owner that a cross section view of the paving taken from test pits showed that specifications had not been followed. However, these test pits were not dug until more than two years after the contrac-

tor had finished his work. Although Mr. Allen Thompson, an engineer from Penniman & Browne, Inc. stated that he did not think the time interval would invalidate the tests, yet, on cross-examination, it became obvious that it would have been preferable if the architect had made the inspection at the time the work was completed. This would have left little room for doubt as to whether the contractor followed the specifications. There was also counter evidence from the contractor's witness, Mr. Richard N. Reed, Jr., an engineer associated with Greenhorne & O'Mara, Inc., that on the basis of strength equivalency standards the paving and subgrading did meet specifications.

Further testimony revealed that the architect's specifications for the parking area were a "low cost high maintenance type design." This came on cross-examination from Mr. Hummer, one of the owner's witnesses, and was also corroborated by Mr. Colevas, testifying for the contractor. The owner noted a continuing objection to Mr. Hummer's testimony. However, we fail to see where this specific question on cross-examination, concerning how he would classify the paving specification, was beyond the general scope of his direct examination. There were also objections raised to Mr. Hummer's testifying as to the specifications of the paving on the lot adjoining the owner's lot, but we do not view this as prejudicial to the owner. It was clearly brought out in questioning that the adjacent lot was a "fill," whereas the owner's lot was mostly a "cut." We think the trial judge was clearly aware of this physical difference and so interpreted the difference in the specifications.

The appellant also objected to the action of counsel for the contractor, when upon cross-examination of the architect, he had the architect identify a copy of a letter dated March 31, 1966, written by the contractor to the architect several days before the paving of the parking area began. The letter was then offered as an exhibit for the contractor. In this letter the contractor reproduced some of the misgivings of the paving subcontractor regarding

the paving specifications provided in the contract, quoting him to the effect:

"This is a minimum pavement design and is not recommended for truck terminals. Therefore, we cannot assume responsibility for possible pavement failures that are not due to improper material or workmanship."

The owner assigns the lower court's ruling on the admissibility of this letter into evidence as one of the grounds for appeal. However, even if the ruling was erroneous we do not think it to be prejudicial. The architect admitted receiving such a letter and certainly he was acting as a representative of the owner. The author of the letter and the paving subcontractor who was quoted in the letter were available to testify and later both did testify but were not questioned by the owner concerning this letter.

The owner also assigns as error the overruling of his objection to the question asked by the contractor's counsel of Mr. Richard N. Reed, Jr., a licensed engineer holding a degree in civil engineering from the University of Maryland. The inquiry pertained to what action he would have recommended had he been the architect and had he received the letter from the contractor questioning the adequacy of the paving specifications. Again, we think the court correctly overruled the objection to this query for the simple reason that the owner had conceded the competency of the witness to testify as an expert concerning the paving. In this narrow scope of planning, we think his reaction and the procedure he would have followed is sufficiently related to the role of an architect as to justify admitting the question and answer. As a matter of fact, his answer that he would have had borings made of the soil and would have made a close analysis of the traffic load does not, in our opinion, unfairly prejudice the owner's case.

Another objection was raised by the owner to the contractor's asking Mr. Reed the hypothetical question, "As-

suming for the purposes of this question that you had not obtained that information [results of test borings of the soil] prior to receiving this letter [letter from contractor questioning adequacy of paving specifications], what actions would you have recommended be taken upon receipt of this letter?" The basis of this objection was that it assumed a fact not in evidence, namely, that the architect had not obtained any soil borings concerning the site in question prior to receipt of the letter. It is true that the evidence did not show that any test borings had been taken of the soil but then again there was no definite evidence that they had not been taken and so the hypothetical question did assume a fact. However, we think the answer to this, which we believe to be harmless error, is found in *Raleigh Manufacturers v. Cantela*, 255 Md. 508, 258 A. 2d 403 (1969), wherein Judge McWilliams writing for the Court stated:

> "Appellants seem to be saying that merely because claimant's counsel incautiously chose to ask a 'hypothetical' question, which we think was quite unnecessary and which seems to have been not at all prejudicial, the case should be sent back to be tried again. As Judge Offutt said, for the Court, in *Gordon v. Opalecky*, 152 Md. 536, 549 (1927), 'it would be trifling with the law to reverse a judgment in a case which has been fully and fairly tried for so trivial an error.'"

The final assignment of error made by the owner involved a line of questioning whereby the contractor through its president, as a witness, was testifying to the relationship that existed between the contractor and the architect incident to work on another job. The court admitted the question and answer in evidence apparently on the theory that it might have some bearing on an inducement extended by the contractor to the architect which in turn might have prompted the architect to respond with deferential treatment. A close reading of the

colloquy between the court and counsel for the owner and of the question and answer does not support the innuendo that the owner is now endeavoring to place upon it nor do we think that it should have been excluded. Actually the owner in questioning the architect, brought out that the architect cast himself in the role of a "good Samaritan" in this case, emphasizing that he was a social and business friend of the contractor and that he tried to get both parties to compromise their differences. The court apparently thought that since Mr. Margulies, president of the contractor, was on the stand as a rebuttal witness, the question was for the purpose of eliciting an answer as to the status of the relationship between him and the architect. In short, this objection appears to be much ado about nothing, and if in allowing the testimony the court committed error, it was harmless error.

The owner also takes exception to the trial judge's adopting as a proper measure of the owner's counterclaim the repair estimate in the amount of $3,037.50 of the Alaska Paving Company. This was a finding of fact made by the Court and although it may at first glance appear as a compromise, it was not without some rational basis to support it. Again, we do not think that the lower court in this regard was clearly erroneous.

As we have heretofore stated in this opinion, the trial of this matter lasted six days and the record extract consumes over 450 pages of testimony and exhibits. We find no merit to any of the contentions urged upon us by the owner in this appeal. If the lower court made any mistakes, the record fails to show them to be either substantial or harmful. We are reminded of the words of Judge Prescott, writing for this Court in *Rippon v. Mercantile-Safe Deposit Co.*, 213 Md. 215, 131 A. 2d 695 (1957), wherein he stated:

> "* * * [T]his Court has frequently held that in the interest of the orderly administration of justice and to avoid useless expense to litigants, it is the policy of this Court not to reverse for

harmless error, and the burden is on the appellant in all cases to show prejudice as well as error. *Sieland v. Gallo,* 194 Md. 282, 71 A. 2d 45; *Balto. Transit Co. v. Castranda,* 194 Md. 421, 71 A. 2d 442." *Id.* at 222.

The court found that whatever may have caused the failure of the paving on the parking lot it was not due to the fault of the contractor. The trial judge concluded that the contractor had fulfilled his obligations under the contract and had met the design specifications for which it called. The principles of contract law applicable to the issues presented are not complicated and we think were correctly set forth by Judge Meloy. In 6 A.L.R. 3d pg. 1394 "Construction Contractor's Liability to Contractee for Defects or Insufficiency of Work Attributable to the Latter's Plans and Specifications," § 2, p. 1397, we find the following comment which lists a number of Maryland cases in support of the text:

> "While a distinction between completed and uncompleted work with reference to the applicability of the rule has been drawn in a few jurisdictions, the rule has become well settled in practically every American jurisdiction in which the matter has been involved, that a construction contractor who has followed plans or specifications furnished by the contractee, his architects, or engineer, and which have proved to be defective or insufficient, will not be responsible to the contractee for loss or damage which results, at least after the work is completed, solely from the defective or insufficient plans or specifications, in the absence of any negligence on the contractor's part, or any express warranty by him as to their being sufficient or free from defects." [Citing *Reinhart Constr. Co. v. Baltimore* (1929) 157 Md. 420, 146 A. 577; *Hammaker v. Schleigh* (1929) 157 Md. 652, 147 A. 790, 65 A.L.R. 1285 (recognized) ; *Gaybis v.*

284

*Palm* (1952) 201 Md. 78, 93 A. 2d 269; *Kerr v. Milwee* (1953) 202 Md. 235, 96 A. 2d 1.]

See also Professor Williston's *Treatise on the Law of Contracts,* Vol. VI, p. 5518.

*Judgment affirmed, appellant to pay costs.*