580 A.2d 1044

**STATE OF MARYLAND DEPOSIT INSURANCE FUND CORPORATION et al.**

v.

**Tom J. BILLMAN et al.**

No. 143, Sept. Term, 1989.

Court of Appeals of Maryland.

Oct. 17, 1990.

4

Neil J. Dilloff (Jonathan D. Smith, Kathleen A. Ellis, Timothy U. Sharpe, Piper & Marbury, J. Joseph Curran, Jr., Atty. Gen., Dennis M. Sweeney, Deputy Atty. Gen., all on brief), Baltimore, for petitioners.

John R. Fornaciari (Robert M. Disch, Eckert, Seamans, Cherin & Mellott, all on brief), Washington, D.C., for respondents.

Argued before MURPHY, C.J., and ELDRIDGE, COLE, RODOWSKY, McAULIFFE, ADKINS * and CHASANOW, JJ.

RODOWSKY, Judge.

In this case of corporate fiduciary disloyalty we examine, against the background of an original record that fills a van, whether prejudice resulted from jury access to, and presumed consideration of, certain documents not in evidence.

Petitioner, State of Maryland Deposit Insurance Fund Corporation (MDIF), prosecutes this action as receiver of Community Savings & Loan, Inc. (CSL), a Maryland chartered, capital stock savings and loan corporation.[1] The action seeks money damages for breaches of the duties of loyalty and care owed to CSL, one of a galaxy of corporations and limited partnerships associated with Equity Pro-

---

* Adkins, J., now retired, participated in the hearing and conference of this case while an active member of this Court but did not participate in the decision and adoption of this opinion.

1. The complaint is brought by MDIF as receiver and by CSL. For brevity's sake we shall refer only to MDIF, as if it were the sole plaintiff.

grams Investment Corporation (EPIC). As this case comes to us, the roster of defendants contesting MDIF's claims has been reduced to the respondents, Tom J. Billman (Billman) and Crysopt Corporation (Crysopt). Billman was the founder of EPIC and a controlling principal in the EPIC group. Crysopt is a holding company wholly owned by Billman.

MDIF obtained a judgment on a jury verdict against Billman in excess of $112 million in compensatory damages. The jury found Crysopt jointly and severally liable with Billman for approximately $94 million of that amount.

This case was tried for sixty-nine days between May 18, 1988, when the jury was sworn, and October 6, 1988, when the jury returned its verdict on the sixth day of its deliberations. On October 5, after the jury had separated for the evening, a courtroom clerk found a box containing eighty-seven unadmitted documents in the jury room. Prior to trial these documents, along with all other potential documentary evidence, had been listed as possible exhibits by one or more parties and had been prenumbered with exhibit sticker labels. The vast majority of the eighty-seven unadmitted documents had been identified at trial, but had not been formally admitted into evidence. This was either because counsel did not formally offer an identified document or because an objection was sustained at the stage of the trial when the document was offered. Of these eighty-seven documents, twenty had been prenumbered by MDIF and sixty-seven by defendants. When the jury commenced deliberations these eighty-seven documents had been delivered into the jury room along with the 1,138 exhibits which had been admitted into evidence. The trial court denied respondents' motions for a mistrial and received the jury's verdict on compensatory damages.

On December 21, 1988, a United States magistrate in the District of Maryland, acting on the sworn complaint of a United States postal inspector, issued a warrant for Billman's arrest on mail fraud and related charges pursuant to 18 U.S.C. §§ 1341, 1343 (1984 & Supp.1990) and 2314 (1970

& Supp.1990), all arising out of Billman's activities in connection with the EPIC group. Issuance of that warrant, however, was kept secret until June 23, 1989. The Government has never been able to serve the warrant. Information obtained by the Government, including that derived from telephone wiretaps, demonstrated that Billman was no longer in the United States. On December 1, 1989, respondents, among others, were federally indicted on the same charges. Crysopt appeared through counsel. Billman has not appeared.

Shortly after return of the verdict, MDIF began efforts to collect the "judgment," and, continuously thereafter, it has vigorously pursued that objective. These efforts included court orders, served on Billman's counsel, for Billman's appearance on at least two separate occasions for examination in aid of execution. Billman never appeared, and the circuit court twice found respondents in contempt. Through their counsel respondents have countered MDIF's collection efforts with motions, appeals and successful applications for stays pending appeal.

Eventually, final judgment was entered in this case, and an appeal was perfected to the Court of Special Appeals. That court reversed and remanded for a new trial. *Billman v. State of Maryland Deposit Ins. Fund Corp.*, 80 Md.App. 333, 563 A.2d 1110 (1989).

MDIF moved that respondents' appeals be dismissed, contending that the intermediate appellate court should not entertain a fugitive's appeal from a civil judgment which was based upon the same course of conduct that had given rise to the criminal charges. The Court of Special Appeals acknowledged that it had applied this " 'Fugitive Appeal Doctrine' " in some unreported decisions dismissing appeals in criminal cases, *id.* at 345, 563 A.2d at 1116, but the court declined, absent any decision from this Court, to extend the doctrine to the facts here. MDIF also argued that respondents' appeal should be dismissed because of their repeated failure to comply with direct orders of the circuit court relating to discovery in aid of execution. Viewing the latter

contention as one addressed to its discretion, and noting the lack of personal service on Billman, the Court of Special Appeals declined to dismiss. *Id.* at 346, 563 A.2d at 1117.

Respondents raised multiple issues in the Court of Special Appeals, but that court found it necessary to address only the trial court's denial of respondents' motion for mistrial. The Court of Special Appeals held "that whenever materials, documents, or matters not in evidence are, nevertheless, present in the jury room and examined by the jury, prejudice to the parties is presumed. The failure of the trial judge to declare a mistrial in the instant case constitutes reversible error." *Id.* at 345, 563 A.2d at 1116.

On MDIF's petition we issued the writ of certiorari to review the intermediate appellate court's denial of MDIF's motion to dismiss the appeal and the reversal of the circuit court's denial of respondents' motion for mistrial.

We shall state additional facts throughout this opinion to the extent necessary to explain the resolution of the issue under consideration.

I

Although this Court has never previously had occasion to consider the "Fugitive Appeal Doctrine," it is widely recognized that an appellate court may dismiss the direct appeal from a criminal conviction brought on behalf of one who is a fugitive at the time of dismissal. At one time the Supreme Court of the United States removed fugitive cases from its active docket, and they remained in a procedural limbo until further order. *See Eisler v. United States*, 338 U.S. 189, 69 S.Ct. 1453, 93 L.Ed. 1897 (1949); *Bonahan v. Nebraska*, 125 U.S. 692, 8 S.Ct. 1390, 31 L.Ed. 854 (1887); *Smith v. United States*, 94 U.S. 97, 24 L.Ed. 32 (1876). Now the Court dismisses cases involving fugitive parties. *See Molinaro v. New Jersey*, 396 U.S. 365, 90 S.Ct. 498, 24 L.Ed.2d 586 (1970); *Eisler v. United States*, 338 U.S. 883, 70 S.Ct. 181, 94 L.Ed. 542 (1949) (per curiam) (memorandum decision). The Court has also sustained, against an equal

protection challenge, the dismissal, authorized by a Texas statute, of the direct criminal appeal of a prisoner who had escaped but who was reapprehended two days later. *See Estelle v. Dorrough*, 420 U.S. 534, 95 S.Ct. 1173, 43 L.Ed.2d 377 (per curiam), *reh'g denied*, 421 U.S. 921, 95 S.Ct. 1589, 43 L.Ed.2d 790 (1975).[2]

There is considerable state authority supporting dismissal of a direct criminal appeal brought on behalf of a fugitive. *See Ex parte Subel*, 541 So.2d 15, 16 (Ala.1989); *People v. Anderson*, 39 Colo.App. 497, 498, 566 P.2d 1369, 1369 (1977); *State v. Leslie*, 166 Conn. 393, 394, 349 A.2d 843, 844 (1974); *Redden v. State*, 418 A.2d 996, 997 (Del.1980); *Jones v. State*, 362 So.2d 149, 149 (Fla.Dist.Ct.App.1978); *Yates v. Brown*, 235 Ga. 391, 392, 219 S.E.2d 729, 731 (1975) (per curiam); *Evolga v. State*, 519 N.E.2d 532, 534 (Ind. 1988); *Weser v. State*, 224 Kan. 272, 273, 579 P.2d 1214, 1215 (1978); *Harris v. Commonwealth*, 311 Ky. 429, 429, 224 S.W.2d 427, 427–28 (1949); *Commonwealth v. Simon*, 391 Mass. 1010, 1010, 461 N.E.2d 758, 759 (1984); *Wheeler v. State*, 249 So.2d 652, 652 (Miss.1971); *Stradford v. State*, 787 S.W.2d 832, 833 (Mo.App.1990); *Arvey v. State*, 94 Nev. 566, 567, 583 P.2d 1086, 1087 (1978); *State v. Rogers*, 90 N.J. 187, 189, 447 A.2d 537, 539 (1982); *People v. Parmaklidis*, 38 N.Y.2d 1005, 1005, 348 N.E.2d 918, 918, 384 N.Y.S.2d 442, 442 (1976); *Prock v. State*, 569 P.2d 473, 474 (Okla. Crim.App.1977); *Commonwealth v. Passaro*, 504 Pa. 611, 615, 476 A.2d 346, 348 (1984); *Lamb v. State*, 293 S.C. 174, 175, 359 S.E.2d 282, 283 (1987) (per curiam); *Bradford v. State*, 184 Tenn. 694, 699, 202 S.W.2d 647, 649 (1947); *Ex parte Reid*, 581 S.W.2d 686, 689 (Tex.Crim.App.1979); *Hardy v. Morris*, 636 P.2d 473, 474 (Utah 1981); *State v. Bono*, 103 Wis.2d 654, 655, 309 N.W.2d 400, 400 (1981).

---

**2.** In *Allen v. Georgia*, 166 U.S. 138, 17 S.Ct. 525, 41 L.Ed. 949 (1897), the Court found no denial of due process in the dismissal by the Supreme Court of Georgia of the appeal in a capital punishment case where the prisoner had fled but had been recaptured.

There have been dismissals of direct criminal appeals by persons who had escaped, and been recaptured before final judgment was entered, and thus were in custody throughout the pendency of their appeals. *See United States v. London*, 723 F.2d 1538 (11th Cir.), *cert. denied*, 467 U.S. 1228, 104 S.Ct. 2684, 81 L.Ed.2d 878 (1984) (escape and recapture during trial); *United States v. Holmes*, 680 F.2d 1372 (11th Cir.1982) (per curiam), *cert. denied*, 460 U.S. 1015, 103 S.Ct. 1259, 75 L.Ed.2d 486 (1983) (escape and recapture after finding of guilty and before sentence). On the other hand, direct criminal appeals have been allowed where the convicted person who fled after verdict and before sentence had been a fugitive for an extended period. See *United States v. Tunnell*, 650 F.2d 1124 (9th Cir.1981) (twelve years); *United States v. Tapia–Lopez*, 521 F.2d 582 (9th Cir.1975) (five years).

With respect to appeals in civil cases there is no decision of the United States Supreme Court supporting dismissal because the party invoking the court's jurisdiction is a fugitive. Arguably, the rationale applied by the Court would not support extension of the doctrine to civil cases. In *United States v. Sharp*, 470 U.S. 675, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1984), the respondents had become fugitives after the Court had granted the Government's petition for certiorari to review an appellate reversal of convictions of the respondents. In rejecting a dissenting opinion's position that the judgment under review should be vacated and the appeal dismissed, the Court distinguished the case before it from those in which "a fugitive defendant is the party seeking review[.]" *Id.* at 681 n. 2, 105 S.Ct. at 1573 n. 2, 84 L.Ed.2d at 612 n. 2. "In those very different cases, dismissal of the petition or appeal is based on the equitable principle that a fugitive from justice is 'disentitled' to call upon this Court for a review of his conviction." *Id.* The disentitlement referred to traces back to *Smith v. United States*, 94 U.S. at 97, where the Court said:

"If we affirm the judgment, [the fugitive] is not likely to appear to submit to his sentence. If we reverse it and

order a new trial, he will appear or not, as he may consider most for his interest. Under such circumstances, we are not inclined to hear and decide what may prove to be only a moot case."

In the civil case now before us the judgment of the Circuit Court for Montgomery County will or will not be effective based upon the merits of the appeal. Neither its effectiveness nor its direct enforcement turns on whether or not Billman remains a fugitive.

Some lower federal courts, however, have applied the doctrine to civil cases brought by fugitive plaintiffs whose guilt of some criminal offense had been determined. When plaintiffs in this class of cases fled, they were either under judgment of conviction, whether or not physically confined, or they had been found, or had pleaded, guilty. The dismissed civil cases usually, but not always, arose out of the same conduct underlying the criminal case. *See Ali v. Sims*, 788 F.2d 954 (3rd Cir.1986) (42 U.S.C. § 1983 (1981) action challenging prison discipline); *United States v. $129,-374 in U.S. Currency*, 769 F.2d 583 (9th Cir.1985), *cert. denied*, 474 U.S. 1086, 106 S.Ct. 863, 88 L.Ed.2d 901 (1986); *Conforte v. Commissioner of Internal Revenue*, 692 F.2d 587 (9th Cir.1982), *stay denied*, 459 U.S. 1309, 103 S.Ct. 663, 74 L.Ed.2d 558 (1983) (Rehnquist, J., opinion in chambers); *Arana v. United States Immigration & Naturalization Serv.*, 673 F.2d 75 (3rd Cir.1982) (denial of habeas corpus affirmed where applicant fled and became object of bench warrant after deportation order had been issued in administrative proceeding); *Doyle v. United States Dep't of Justice*, 668 F.2d 1365 (D.C.Cir.1981), *cert. denied*, 455 U.S. 1002, 102 S.Ct. 1636, 71 L.Ed.2d 870 (1982) (affirming dismissal of action to obtain documents under Freedom of Information Act); *Shaw v. Estelle*, 542 F.2d 954 (5th Cir. 1976) (affirming dismissal of civil rights action regarding prison discipline); *Broadway v. City of Montgomery, Alabama*, 530 F.2d 657 (5th Cir.1976) (civil rights action alleging fourth amendment violation leading to subject's arrest and conviction).

A few civil cases have also been dismissed at the trial or appellate level when brought by fugitives who have been criminally charged but whose guilt has never been established in a criminal proceeding. Among these are cases involving claims to property subject to forfeiture to the sovereign because of the claimant's alleged criminal conduct. *See United States v. One Parcel of Real Estate at 7707 S.W. 74th Lane, Miami, Dade County, Fla.*, 868 F.2d 1214 (11th Cir.1989); *United States v. $45,940 in U.S. Currency*, 739 F.2d 792 (2d Cir.1984); *United States v. Certain Real Property Located at 760 Southwest 1st Street, Miami, Fla.*, 702 F.Supp. 575 (W.D.N.C.1989).

Other civil cases dealing with unconvicted fugitives are not forfeiture offshoots of criminal prosecutions. In *Securities & Exch. Comm'n v. Tome*, 833 F.2d 1086, 1087 n. 1 (2d Cir.1987), *cert. denied*, 486 U.S. 1014, 108 S.Ct. 1751, 100 L.Ed.2d 213 (1988), the court dismissed Tome's appeal from a civil judgment, based on insider trading, where Tome had fled the United States three years before he was indicted on related charges and five years before the civil judgment was entered. See also *Securities & Exch. Comm'n v. Tome*, 638 F.Supp. 596, 620 n. 44 (S.D.N.Y. 1986). And *see Schuster v. United States*, 765 F.2d 1047 (11th Cir.1985) (affirming dismissal of fugitive indictee's challenge to jeopardy income tax assessment); *United States v. U.S. Commanding Officer of the Office of the Provost Marshal, U.S. Army*, 496 F.2d 324 (1st Cir.1974) (habeas corpus denied where applicant fled after court-martial charges brought); *Dawkins v. Mitchell*, 437 F.2d 646 (D.C.Cir.1970) (affirming refusal to enjoin execution of warrant under Fugitive Felon Act); *Brin v. Marsh*, 596 F.Supp. 1007 (D.D.C.1984) (mandamus to compel petitioner's discharge from U.S. Army denied where petitioner fled while freedom of movement restricted during criminal investigation).

We shall assume, *arguendo*, that a Maryland appellate court has the power to dismiss Billman's appeal under the facts of this case. It does not follow, however, that we

are compelled to do so. Exercise of the power is discretionary. *See Clark v. Dalsheim,* 663 F.Supp. 1095, 1097 (S.D. N.Y.1987); *United States v. Veliotis,* 586 F.Supp. 1512, 1514 (S.D.N.Y.1984); *State v. Byrd,* 448 N.W.2d 29, 32 (Iowa 1989).

■ In the exercise of our discretion, we deny dismissal under the fugitive doctrine. Here the Court of Special Appeals proceeded to examine the merits of the appeal and concluded that there was error which required reversal. It is not in the interest of justice to order the appeal dismissed and the judgment of the circuit court reinstated, without any review of the merits by this Court, when a reported opinion by the Court of Special Appeals concludes that the circuit court judgment must be reversed. Further, as we shall demonstrate in Part III, the Court of Special Appeals did not apply the proper standard in its error review. Consequently, we should address the merits under the proper standard in a certiorari review.

## II

■ MDIF's argument for dismissing the appeals based on respondents' non-compliance with circuit court orders is unpersuasive, both legally and factually.

For the argument's foundation in Maryland law MDIF relies upon a general rule, described in *Gilbert v. Arnold,* 30 Md. 29, 35 (1869), as laid down by Lord Chief Baron Gilbert, which this Court last applied in unmodified form in *Skirven v. Skirven,* 154 Md. 267, 140 A. 205 (1928). *Skirven* dismissed the appeal by a husband from the trial court's refusal to consider a reduction in alimony *pendente lite,* a refusal based on the husband's being in contempt for failure to pay at the prescribed rate. The Court said:

"[H]ere the rule is that, while one adjudged guilty of contempt may attack the finding directly, he cannot, so long as it stands unimpeached, be permitted as a matter of right to make any motion, file any petition, or assert

any claim for relief, in the particular suit in which the contempt has been adjudicated."

*Id.* at 271, 140 A. at 207.

*Skirven* was distinguished in *Gunter v. Gunter*, 187 Md. 228, 49 A.2d 454 (1946). An absolute divorce had converted the parties' realty into a tenancy in common, but the trial court had dismissed a bill for partition sought by the former husband because he was in default on alimony payments. We reversed, pointing out that in *Skirven* "the trial court did not undertake to finally dispose of any right, but merely required the petitioner to purge his adjudicated contempt, as a condition to granting him relief in the same proceeding." *Id.* at 234, 140 A. at 457.

*Skirven* was argued in support of dismissing the appeal in *Rethorst v. Rethorst*, 214 Md. 1, 133 A.2d 101 (1957), which had been brought by a divorced father who sought the custody of his children and who, argued his former wife, was in contempt of court. Chief Judge Brune, writing for the Court, noted the *Gunter* distinction, but went on, in reliance on decisions from other jurisdictions, to conclude that

"[t]he general rule which now seems well established is that the fact that the husband is in contempt will not prevent his litigating his substantial rights in connection with which the contempt was committed."

*Id.* at 10, 133 A.2d at 457.

Most recently, in an interstate custody dispute we said, citing only to *Rethorst*, that "the fact that the mother had been adjudged in contempt [did not] bar her from taking an appeal and litigating her substantial rights in connection with which the contempt was committed." *Miller v. Miller*, 247 Md. 358, 362, 231 A.2d 27, 30 (1967).

Under these principles, we could not properly dismiss respondents' appeals. Respondents did not comply with circuit court orders to appear and be examined in aid of execution. Those orders led to contempt findings and orders that the respondents pay to MDIF specified sums of

money, each day, until respondents purged themselves of the contempt. But MDIF's right to asset discovery under Maryland Rule 2–633 is dependent upon MDIF's being a judgment creditor holding a money judgment. The substance of respondents' position is that the judgment should be reversed on the merits, a position with which the Court of Special Appeals agreed. Nor are the respondents in continuing contempt by the failure to pay to MDIF the daily penalties assessed by the circuit court. Enforcement of those contempt sanctions was stayed by orders of appellate courts.[3] Under these circumstances it is not appropriate to dismiss the appeals.

## III

The Court of Special Appeals reversed and remanded for a new trial because the unadmitted documents were available to the jury during its deliberations. Because the unadmitted documents formed part of the mass of materials which bore plaintiff's or defendants' exhibit stickers, we shall assume that the jury did not distinguish between the documents properly in evidence and those which were not formally admitted. The Court of Special Appeals' analysis, however, was that "prejudice to the parties is presumed." *Billman*, 80 Md.App. at 345, 563 A.2d at 1116. Thus the

---

**3.** In addition, the first order directing respondents to give discovery in aid of enforcement of a money judgment, and the contempt order enforcing that discovery order, were entered before there was a final judgment. MDIF had sought punitive damages on its claims. The punitive damages issue was submitted to the jury after its verdict on compensatory damages, but, before any verdict on punitive damages was rendered, the circuit court declared a mistrial. No party argues that the grounds for that mistrial are relevant to the issues before us.

The circuit court certified, under Maryland Rule 2–602, the judgments entered on the verdicts for compensatory damages. That certification was ineffective because MDIF's claims were not wholly terminated due to the outstanding request for punitive damages on the same claims. Final judgment was not entered as to respondents until MDIF had voluntarily dismissed its request for punitive damages and until a bankruptcy judge in the United States District Court for the Eastern District of Virginia had signed an order dismissing Billman from federal bankruptcy.

intermediate appellate court immediately concluded that the trial court committed reversible error in denying respondents' motion for a mistrial. To support its conclusion, the court principally relied upon two New York decisions, *Public Operating Corp. v. Weingart*, 257 A.D. 379, 13 N.Y.S.2d 182 (1939) (new trial awarded where jury considered unadmitted list of replevied property bearing valuations determined in a manner contrary to court's instructions); and *Aiken v. Dunn*, 1 Misc.2d 215, 147 N.Y.S.2d 450 (St. Lawrence Co.1955) (denying new trial in personal injury case where juror brought into jury room book entitled, *How to Serve on a Jury*).

The approach used by the Court of Special Appeals in this case is contrary to well established Maryland law. The standard for evaluating whether a new trial should be granted under the circumstances here, where the jury deliberations included unadmitted documents, does not differ from a situation where the jury considers evidence admitted by the trial court which is later determined to have been erroneously admitted. *Beahm v. Shortall*, 279 Md. 321, 368 A.2d 1005 (1977), is a case of the latter type. There Judge Orth, writing for the Court, extensively reviewed our cases.

"Precise standards for the degree of prejudice required for reversal, have not been, and perhaps cannot be, established. In *Rippon v. Mercantile–Safe Dep., supra,* 213 Md. [215,] 222, [131 A.2d 695, 698 (1956),] we noted that the complaining party made no effort to show 'unfairness or harm.' In *Hance v. State Roads Comm.*, 221 Md. 164, 176, 156 A.2d 644[, 650] (1959) we observed: 'Courts are reluctant to set aside verdicts for errors in the admission or exclusion of evidence unless they cause substantial injustice,' so 'substantial prejudice' must be shown. In *Rotwein v. Bogart*, 227 Md. 434, 437, 177 A.2d 258[, 260] (1962) we declared that 'this Court will not reverse for an error below unless the error "was both manifestly wrong and substantially injurious" ', quoting 2 *Poe on Pleading and Practice* (Tiffany's ed.) § 287, p. 249. In *State Roads Comm. v. Kuenne, supra,* 240 Md. [232,] 235, [213

A.2d 567, 568,] we spoke in terms of the error having 'a prejudicial effect on the outcome of the case.' In *I.W. Berman Prop. v. Porter Bros.*, 276 Md. 1, 11–12, 344 A.2d 65[, 72] (1975), we repeated the 'both manifestly wrong and substantially injurious' language of *Rotwein v. Bogart, supra*, and added: 'An error which does not affect the outcome of the case is "harmless error".' " 279 Md. at 331, 368 A.2d at 1011.

Of course, "what constitutes prejudice warranting reversal in the erroneous admission ... of evidence is to be determined on the circumstances of each case." *Id.* at 332, 368 A.2d at 1012. In *Beahm* the receipt as substantive evidence of a personal injury plaintiff's subjective symptoms, as narrated by a non-attending medical expert, "was not 'substantially injurious' so as to have a prejudicial effect on the outcome of the case." *Id.* This was because the substance of that evidence had been admitted as part of the testimony of the plaintiff and of the attending physician.

The rule is the same for erroneously admitted documents. *Compare Dillon Properties, Inc. v. Minmar Builders, Inc.*, 257 Md. 274, 262 A.2d 740 (1970) (hearsay in inadmissible letter found not prejudicial) *with Smith v. Jones*, 236 Md. 305, 203 A.2d 865 (1964) (hearsay in inadmissible letter found prejudicial).

■ In determining whether improperly admitted evidence, or extraneous matter considered by a jury, prejudicially affected the outcome of a civil case, the appellate court balances " 'the probability of prejudice from the face of the extraneous matter in relation to the circumstances of the particular case....' " *Harford Sands, Inc. v. Groft*, 320 Md. 136, 138–39, 577 A.2d 7, 8 (1990) (quoting *Wernsing v. General Motors Corp.*, 298 Md. 406, 420, 470 A.2d 802, 809 (1984)). It is not the possibility, but the probability, of prejudice which is the object of the appellate inquiry. *Harford Sands*, 320 Md. at 148, 577 A.2d at 12–13. Finally, " '[i]t is the function of the trial judge when ruling on a

motion for a new trial to evaluate the degree of probable prejudice and whether it justifies a new trial. That judgment will not be disturbed but for an abuse of discretion.' " *Id.* at 146, 577 A.2d at 12 (quoting *Wernsing,* 298 Md. at 420, 470 A.2d at 809).

## IV

To evaluate whether respondents were prejudiced by the unadmitted documents in the circumstances of this case requires some general background on the nature of EPIC's business, its relationship to CSL, the claims asserted by MDIF, and the way in which MDIF proved those claims.[4]

## A

Billman founded EPIC in the mid–1970s. Basically its business, headquartered in Northern Virginia, was selling tax shelters in real estate. EPIC's success depended on a continuing upward spiral of real estate values throughout the country, and particularly in Texas where EPIC invested heavily. Since early 1982 one or more holding companies controlled by Billman (collectively, EPIC Holdings), held, directly or indirectly, all of the capital stock of CSL. EPIC Holdings was 80% owned by Billman, until February 1985, and 20% owned by a co-defendant, Clayton A. McCuistion (McCuistion). In March 1983, EPIC merged into CSL's direct subsidiary, service company which changed its name to EPIC. Thereafter, organizationally, though not in practice, EPIC was a subsidiary of CSL.

Billman utilized the deposits in CSL for EPIC's cash requirements. As EPIC's business slowed in 1984 and 1985, its cash requirements became greater. In a February 1985 reorganization Billman sold his 80% interest in EPIC Holdings to McCuistion for $14 million in cash and for other considerations valued in excess of $16 million, including

---

4. Respondents made no argument in the Court of Special Appeals that the evidence was insufficient to support the verdicts on any of MDIF's claims.

realty on Maryland's Eastern Shore. CSL was placed in conservatorship in early September 1985 and eventually was liquidated in receivership.

In its tax shelter business EPIC sold participations in limited partnerships of which it was the sole general partner, usually holding a 1% interest. Initially EPIC partnerships invested in model homes purchased from builders of tract housing. Later the partnerships also bought production houses and condominiums from builders. The parties, as shall we, at times have called the investments in the partnerships and the residences owned by the partnerships the "EPIC product." EPIC partnerships financed their real estate acquisitions with mortgage loans from EPIC Mortgage, Inc. (EMI), another CSL subsidiary.[5] These residences were then rented by the partnerships to tenants. In theory residences would be held for no more than four or possibly five years and then sold, at which time the partnerships' creditors, including the holders of the first mortgages, would be paid, the capital contributions of the limited partners returned, and any profit distributed to EPIC and the limited partners per the partnership agreement.

A unique feature of the EPIC concept was that the builder who sold a residence agreed to pay the buying EPIC partnership a rebate, called a rental deficit contribution (RDC). An RDC theoretically represented the present value of the monies required every month to meet the difference between the estimated carrying costs of the property and the total of (1) net rentals realized and (2) limited partners' monthly capital contributions to the partnership.

---

**5.** Essentially, the funds advanced by CSL through EMI on the purchase money, first lien mortgages are not involved in the case before us. EMI either sold those mortgages to other lenders or sold interests in pools of those mortgages to other lenders, as evidenced by mortgage pass through certificates. These purchase money mortgages and pass through certificates were privately insured. The efforts of the private insurers to rescind their coverage for alleged fraud are recounted in *Foremost Guaranty Corp. v. Meritor Savings Bank,* 910 F.2d 118 (4th Cir.1990), *aff'g in part and rev'g in part In re Epic Mortgage Ins. Litigation,* 701 F.Supp. 1192 (E.D.Va.1988).

The dominant policy of the EPIC group was to avoid default by any EPIC partnership in order to maintain investor confidence. Particularly in 1984 and 1985, rents, RDCs and limited partner contributions from the various partnerships were commingled and the funds were used where most urgently needed. Another CSL subsidiary, EPIC Residential Network, Inc. (ERNI), sought to sell, through a national network of real estate brokers, a growing inventory of non-owner occupied or vacant residences owned by matured partnerships. New EPIC partnerships (resyndications) were formed to buy from matured partnerships homes which had not been resold to independent buyers. Cash obtained from these new, limited partnerships was used for the cash requirements of matured partnerships.

The ultimate source of funds was CSL. Its deposits were advanced directly to EPIC partnerships and indirectly to them through EPIC, EMI, and ERNI in order to satisfy the cash needs of the partnerships. These loans were essentially unsecured. Where security by means of a second mortgage on a house was attempted, the second mortgages were unrecorded. By September 5, 1985, the date of the court ordered conservatorship of CSL, there were 357 outside investor, limited partnerships. Those partnerships, EPIC, EMI, and ERNI owed CSL $82.3 million in loans and loan interest as of that date.

B

The theory of count I of MDIF's complaint was that these loans violated state regulations and that the defendants violated their duty of care applicable to the circumstances. MDIF requested a verdict of $49,255,381 on count I. The jury returned a verdict against the respondents and others for $49,255,381 on count I. Those damages represent the projected net loss to CSL on the loans to EPIC entities, after credit is given to the defendants for the value of the consideration received by CSL in the sale of its assets in the receivership "workout."

There were also three EPIC limited partnerships in which the limited partners were persons who were fiduciaries of CSL. As of August 31, 1985, the advances by CSL to these insider partnerships totaled $8,364,827. Count II of the complaint was predicated on this violation of the duty of loyalty and on Md.Code (1980, 1986 Repl.Vol.), § 9–307(c) of the Financial Institutions Article (FI) which prohibits a savings and loan association from making a loan to any partnership in which an interest of 10% or more is owned by controlling persons, directors, officers or employees of the association. The jury returned a verdict against the respondents and others in the amount of $8,364,827 on count II.

On February 21, 1984, CSL paid a dividend of $6,373,331 for the year 1983 to EPIC Holdings and thus, ultimately, 80% to Billman and 20% to McCuistion. On February 7, 1985, CSL again paid a dividend of $7,999,998 for the year 1984. MDIF contended in count III of its complaint that these dividends were unlawful. Although CSL's financial statements for those years reported a net worth which would have permitted payment of these dividends, MDIF's position was that CSL's assets were overstated and should have been reduced. For example, as of year end 1984, CSL reported a net worth of $26.8 million whereas MDIF contended that CSL had a negative net worth of $25.6 million. On count III MDIF sought to recover the $14,373,329 of dividends paid. The jury returned a verdict against Billman and others on count III for $14,373,329.

The defendants also required CSL and its subsidiaries, by an agreement with EPIC Holdings of March 1, 1983, to prepay their taxes to EPIC Holdings for the purported purpose of insuring that cash would be available to pay tax obligations. Count IV of MDIF's complaint challenged this arrangement as an unsafe business practice and as a violation of the duty of loyalty. One consequence of the arrangement was that CSL could not enjoy the tax advantages of the losses being incurred by EPIC. In the period 1983 through 1985 CSL and its subsidiaries paid to EPIC Holdings $32 million under the tax allocation agreement.

During that same period EPIC Holdings paid no federal taxes, paid $1 million in state taxes, and retained $31 million of the tax payments. Utilizing these funds EPIC Holdings on January 9, 1985, paid a $14 million dividend, $11.2 million to Billman and $2.8 million to McCuistion. In count IV, MDIF claimed the total of the "prepaid" taxes remitted in both years, $31,036,470. The jury returned a verdict against the respondents and others for $31,036,470 on count IV.

Count V of MDIF's complaint involved three types of transactions which MDIF loosely classifies as unlawful fees. The principal component of the claim, $4,754,023, consists of management fees paid by CSL and three of its subsidiaries to EPIC Holdings for the three years ending December 31, 1985. MDIF proved that no meaningful services were rendered by EPIC Holdings and that the management, accounting and legal services performed for CSL and its subsidiaries were rendered by their own employees or by independent contractors. A second component of count V involved two other subsidiaries of EPIC Holdings from which CSL and its subsidiaries were required to lease furniture and equipment. CSL was also required to pay the tax liabilities of those leasing companies. They were ultimately sold to CSL. MDIF's claim of $812,394 represents the profit made by EPIC Holdings through those two leasing corporations.[6] The third component of the claim is $200,000 paid to EPIC Holdings by CSL on a transaction known as Plaza East. The ostensible reason for that payment has never been determined. MDIF sought $5,766,417 on these three components of count V. The jury returned a verdict of $5,766,417 against respondents and others on count V.

---

6. Specifically, MDIF claimed the total of the purchase prices, $417,-340, and the total of the tax payments, $397,054, less the investment by EPIC Holdings in the two leasing corporations, namely, $1,000 each.

Count VI of the complaint alleged breaches of duty on the part of certain non-corporate defendants in the payment of excessive salaries, bonuses, and perquisites during the three years ending December 31, 1985. Eliminating duplication with the other counts, MDIF sought from Billman and certain other defendants, $3,401,400 on count VI. The jury returned a verdict against Billman and others for $3,401,400 on count VI.

### C

A central theme of MDIF's presentation of its case was that Billman used CSL to "feed the EPIC machine." The quoted language is set forth verbatim in the minutes of a special meeting of the CSL Operations Committee of April 15, 1985. Those minutes refer to an October 1984 meeting of the presidents of seven EPIC group companies and of CSL at which goals were set for all. Those minutes state that "[CSL's] # 1 goal as the deposit center is to attract deposits to feed the EPIC machine...."

Collectability of the $82.3 million in advances by CSL to or for the benefit of the EPIC partnerships depended almost entirely on appreciation of the homes owned by the partnerships. These advances by CSL were junior to the first liens of the purchase money mortgages which had been sold to entities outside the EPIC group. In the matured partnerships the RDCs were exhausted and the limited partners had no further obligation to contribute capital. CSL theoretically had recourse against the unlimited liability of the general partner, but the general partner, EPIC, directly owed to CSL $14.7 million of the $82.3 million in advances involved in count I. Income of the matured partnerships was limited to whatever net rent the properties could produce. The structure of the transactions, however, had never anticipated that the net rents would carry the property, as evidenced by the need for RDCs.

Against this background, a major portion of MDIF's case was devoted to establishing that the CSL fiduciaries could not reasonably have expected to recover from equity in the partnerships' realty the advances which CSL continued to make. Insufficient equity in the EPIC product was relevant to count I where MDIF sought CSL's net loss on the loans to EPIC partnerships and entities. Insufficient equity in the EPIC product was also relevant to count III where the issue was basically whether the need for reasonable reserves for bad debts under the circumstances of this case made it unlawful to take dividends out of CSL.

The witness whom MDIF used to present its case as a cohesive whole was David A. Carpenter (Carpenter), the national director of litigation services for Coopers & Lybrand, an international accounting and consulting firm. Carpenter's firm was engaged by MDIF to assist in day-to-day operations of the conservatorship and receivership and also to do a comprehensive analysis of the EPIC group transactions. That study involved approximately seventy EPIC related entities as well as approximately 360 EPIC partnerships. The study required examining documents which filled 2,000 transfiles. Over 100 different people expended over 20,000 hours of effort in the study.

In Carpenter's opinion the CSL loans to EPIC entities were "grossly imprudent," for many reasons. They were used to fund negative cash flows, *i.e.,* "real money [with] [n]o depreciation included...." The EPIC partnerships' negative cash flow for 1982 was $25 million. In a February 21, 1983, memorandum to Billman from a co-defendant, the combined cash flow deficit for that year was predicted to be $38.3 million. In fact it was $38.6 million, cumulatively, at the end of that year. By the end of 1984 the cash flow deficit was $51 million. When the conservator took possession in 1985 the cumulative, negative cash flow of the partnerships was $113 million.

CSL had no lien on its only source of repayment, the EPIC product. CSL was a general, unsecured creditor, junior to the holders of the first liens. Carpenter testified

that the partnerships were highly leveraged. EMI purportedly made the first mortgage loans at 95% of value. Moreover, payment by the seller to EPIC of the RDCs meant that the partnerships were borrowing over 100%, and up to 120%, of value. Thus there was no equity from which CSL could be repaid. From an income standpoint the vacancy rate for EPIC product in January 1984 was 19.4%.

The fact that the ultimate repayment depended on rental housing as opposed to owner occupied dwellings increased the risk. To limit that risk a Maryland Department of Savings and Loan (DSL) regulation required associations to maintain a minimum of 50% of total assets invested in owner occupied dwellings. CSL's percentage was below 10% in 1983 and 1984 and below 20% in 1985. Indeed, a February 27, 1984, memorandum from CSL's president to Billman advised that CSL was $120 million short of the 50% minimum. In Carpenter's opinion risk was also increased by the geographical distance between CSL and the EPIC product. Of 18,084 houses owned by the partnerships as of January 1985, 58.19% were in Texas, 8.38% in California, 6.37% in Florida, and 5.28% in Arizona. This geographical concentration, particularly in Texas where real estate values were declining, also increased the risk.

Carpenter emphasized the poor resale record of EPIC product. EPIC internally projected sales of 693 homes in 1983, but 174 were sold. Of these, 161 were sold to resyndicated EPIC partnerships and only thirteen to independent third parties. For 1984 sales of 1,316 houses were projected, but 324 were actually sold. Of these, 301 were sold to resyndicated partnerships and only twenty-three to independent third parties. Eleven of those twenty-three sales included either ERNI's guarantee that a specified amount of rent would be paid by the tenant or ERNI's payment of a rental subsidy. For 1985 EPIC projected sales of over 10,000 homes. One hundred twenty-five were sold. One hundred seventeen of these sales included a rental guarantee or subsidy, six included no guarantee or subsidy, and two were sold to resyndicated partnerships.

In May 1984 a financial services corporation, Private Ledger, rendered a due diligence report on one of the partnerships, EPIC Associates 84 VI. The defendants came into possession of a copy of the report and responded to it. EPIC's offering, the report said, "is identical to buying a single house that is substantially (59%) over priced and rents for half of what it costs to carry." The report pointed out that EPIC's fees were "VERY HIGH ... at least ... [50%] of the capital raised." It warned that the offering would probably be judged a " 'Tax Abuse' " because the venture lacked economic viability. It said "[t]here is no equity, to provide investors with an incentive to pay nonrecourse debt[.]" Private Ledger thought that "[t]he properties are so over financed and under rented that no amount of inflation can bail out the program." With respect to EPIC's projections the financial service said:

> "The sponsor's sales projections are erroneously based on appreciation from a false basis of value. Appreciation must be calculated from the properties' value which is the amount the seller netted from the sale ($3,003,000). The arbitrarily construed 'cost' ($3,701,875) is unrealistic and falsely over states value."

MDIF also produced evidence concerning the experiences which some mortgage insurers had with EPIC. Commonwealth Mortgage Insurance Company (Commonwealth) began insuring a small quantity of the EPIC product in early 1984. Dissatisfied with the results of spot check appraisals, that insurer ceased insuring the EPIC product in early December 1984. After receiving certain assurances from EPIC, the insurer resumed the relationship but terminated it again in August 1985. Commonwealth would not insure mortgages which exceeded 95% of market value. Commonwealth's president believed that EPIC "very knowingly" loaned in excess of 95% of market value.

General Electric Mortgage Insurance Company refused to insure mortgages on the EPIC product because, in essence, there was only one borrower, namely, EPIC.

Another insurer, Mortgage Guaranty Insurance Corporation (MGIC), insured EPIC product mortgages as early as 1981. It refused to accept any more EPIC product in August 1983. Spot check appraisals by MGIC in June 1982 indicated that EPIC's appraisals contained inflated property values. In an internal report of June 1983 MGIC concluded that further spot check appraisals supported a theory that "EPIC's value was artificially derived by adding builder fees/contributions in any given transaction to the true market value of the property." MGIC's vice president for residential underwriting at the time believed that the overvaluation may have been "due to a need to sell the property at a price that would make the partnership work."

Particularly noteworthy for present purposes is that these insurers were concerned about first liens which enjoyed priority over the unsecured advances by CSL involved in MDIF's claims.

Emergency legislation addressing the May 1985 savings and loan crisis in Maryland included the merger of the private insurer of savings and loan accounts, Maryland Savings Share Insurance Corporation (MSSIC), into MDIF and the elimination of any deposit insurance by the State. As a result CSL and its related companies were examined by the Federal Home Loan Bank Board (FHLBB) for possible insurance on accounts by the Federal Savings and Loan Insurance Corporation (FSLIC). The examination was as of May 24, 1985. On June 21 Joseph Hilliard (Hilliard), the examiner in charge, preliminarily reported to C. Lamar Heath (Heath), the district director, that, in the opinion of the FHLBB's District Appraiser, "all of the appraisal reports [on the EPIC product] are overinflated from 20% to 25%, in effect[,] by the amount of the discounts given the purchaser by the builder/seller." In a cover memorandum dated August 21, 1985, transmitting the final report of examination on CSL, Hilliard advised Heath that CSL had substandard assets carried on the books at $107.8 million, representing 23.7% of CSL's assets, with potential indicated losses totaling $98.2 million. Substandard assets included

$52.1 million invested by CSL in EPIC partnership loans. Hilliard reported that "[t]hese losses are the result of the properties being overvalued. The appraisal reports prepared on these security properties were found to be unacceptable for FHLB purposes and should be discounted a minimum of 25%." It was reported that CSL had $26.4 million of unrecorded second mortgage loans which "are a total loss" and that EPIC corporations received $40.9 million of unsecured advances which "are total losses."

The FHLBB report was in part based on sample testing of the EPIC appraisals by Richard Hewitt (Hewitt), who had formerly been the chief appraiser for the FHLBB's Fourth District, headquartered in Atlanta. At the time he took the sampling, Hewitt was a private consultant. Appraisals for the first mortgage loans originated by CSL were arranged through Continental Appraisal Group (CAG), a company in which Billman and McCuistion held minority interests. Hewitt said that the appraisal guidelines of CAG did not require cash equivalency, that is, adjustment of the selling prices of comparable properties to typical market financing. Indeed, Hewitt found use of the EPIC product as the norm or market to which comparables were adjusted, rather than to a third party lender's financial norm.

In addition, Hewitt testified that RDCs ranged from 20% to 25% of the purported purchase price. In each of the ten or fifteen appraisals which Hewitt reviewed there was a "carry through" from the RDCs. To illustrate, Hewitt used a hypothetical transaction in which the purchase price is $100,000, real estate commission is $6,800 (paid to EPIC), and RDC is $24,000, so that the net purchase price is $69,200. With a $95,000 mortgage (95% of $100,000, assuming $100,000 is the value of the property), EPIC walked away from settlement with $25,800.

Hewitt then explained the effect on his opinion of the scale of EPIC's operations.

"Again, if the value of the home was $100,000, that is one thing. If that is the market value of the home, and certainly if for whatever reason you are able to go to the

market where homes similar to this property are worth $100,000, but through your superior negotiating ability or what have you you find a good deal, quote unquote, and that happens from time to time. You are able to get a good deal.

"I think every purchaser in the market is looking for the good deal. You may be able to buy at less than the true market value of a piece of property.

"Q Okay, so this is a good deal, right?

"A In its classic sense, that would be a good deal.

"Q There is nothing wrong with getting a good deal, is there?

"A Oh, absolutely not. It makes the whole system work.

"Q Okay.

"A However, and what hit me, quite frankly, was the scale of the operation where we were dealing with approximately 20,000 homes, it seemed very questionable to me that anyone would be able to go across the country and routinely be able to buy homes for 25 percent less than the market value of those homes. That just sounded absurd on its face."

Further, Hewitt was very familiar with the Texas real estate market which was "in horrible shape" in the summer of 1985. For these reasons Hewitt recommended to FHLBB that the real purchase value of the EPIC product be reduced by 25% to 40% of the purported purchase prices paid, depending on the market in which a particular property was located. Relying to a large degree on Hewitt's opinion, FHLBB wrote down CSL's assets by $77.1 million.

Prior to trial of this case Hewitt and his staff studied a larger sample of the EPIC product. That study included on site inspections in various states. At trial Hewitt opined that the appraisal and loan underwriting practices at CSL with respect to its advances to EPIC and the EPIC partnerships were "very reckless."

The conservator appointed for CSL was Bruce McPherson who was accepted as an expert in lending practices. In his view CSL's loans to the EPIC partnerships and entities were "grossly imprudent and recklessly endangered the life of the institution." There were 3,176 loans to EPIC partnerships, totalling $27.7 million. These loans were documented as second trusts on 3,100 houses, but the instruments were not recorded so that the loans were unsecured.[7] By the time of trial 2,225 of these houses had been sold. Approximately 2% of the houses, that is, fifty-four of them, had sufficient equity to repay the CSL loans.

On the valuation issue, MDIF's case did not lack confirmation from within EPIC. A CPA, Linda Smith (Smith), was controller and, later, vice president for asset management at EPIC. She served on the Disposition Committee, one of the tasks of which was to identify particular houses to be sold at arms length or included in a resyndication. As an aid for that analysis, Smith did a computer run on data as of September 5, 1984, involving certain EPIC partnerships which owned a total of 1,141 housing units. Smith projected the effect of liquidating each unit, and she aggregated the results to simulate a total liquidation of each partnership involved. In the principal projection Smith assumed selling costs of 4% of the selling price. She used the highest currently available appraisal as the selling price. The results were presented to the Disposition Committee in a blue covered, spiral bound book (the Blue Book). The Blue Book revealed that so many of the partnerships, if liquidated, would be unable fully to return capital to limited partners after payment of the partnership debts that one of Billman's co-defendants ordered Smith to destroy all copies of the Blue Book. Smith, however, did not destroy all

---

7. The difference of seventy-six between the number of loans and the number of houses apparently reflects instances where the same house was offered as collateral twice so that, if all recordings had been accomplished, seventy-six of the loans would have been "secured" by a third lien.

copies. She retained one for herself, which became an exhibit at trial.[8]

Smith also analyzed the data by classifying the 1,141 properties into four categories. Class A assumed selling costs of 12%, representing a 6% real estate sales commission, four points paid by the seller, and seller's closing costs equal to 2%. On that assumption, which the jury could have found to be reasonable, only ninety-five properties would sell at prices which would net an amount sufficient to pay the first mortgage, all advances, and all capital contributions by limited partners. That is to say, only ninety-five properties would fulfill the EPIC concept. If selling costs were assumed to be 4% of the selling price, 522 properties (Class B) would produce a small, partial return on capital to limited partners. If the properties could be sold without any selling costs, that is, resyndicated, six properties (Class C) could repay all advances but would not return any capital. Even on the assumption that there would be no costs of sale, 518 properties, or 45.4% of all properties in the study, would not pay back the advances, much less return any capital to the partners (Class D).

An attorney, Mark Moorstein (Moorstein), worked for EPIC from May 1983 to July 1984. He was hired as special assistant to the president of EPIC, Leonard Meltz, one of the defendants. By early September of 1983 Moorstein became director of EPIC's Offerings Department and in January 1984 a vice president of EPIC. His concerns about the EPIC concept caused him to make a number of studies. He found that the vacancy rates and length of vacancies in the EPIC product were higher than represented in the private placement memoranda used to sell participations in the partnerships. He studied the ratio of houses acquired to houses sold and found that there was a "tremendous

---

8. Billman was a member of the Disposition Committee and a copy of the Blue Book was prepared for him. Smith could not recall whether Billman was present at the meeting at which the instructions to destroy the Blue Book were given. Billman's handwriting does appear on one ancillary analysis derived from the Blue Book data.

accumulation of unsold houses[.]" From mid–1982 to mid–1983 the ratio of houses acquired to houses sold was 1.1 to one. From mid–1983 to mid–1984 the ratio was four to one. This meant that the cost of maintaining those houses was continually escalating. This confirmed in Moorstein's mind "that the entire structure was, in effect, a house of cards." Moorstein sent the results of his studies to the "major players," including Billman. Moorstein was fired for causing " 'too much disruption in the company.' "

It was also essential to the continued marketing of participations in EPIC's tax shelters that EPIC be able to include in its private placement offering memoranda an unqualified opinion by independent auditors, and it was highly desirable that the auditing firm have a national reputation.[9] From the inception of all of the companies in the EPIC group their auditor was a firm local to northern Virginia, James C. Jones & Co. (Jones). In the financials on which Jones had opined, EPIC presented the RDCs as income to EPIC upon EPIC's receipt of an RDC from a builder.

In the fall of 1979 EPIC engaged Arthur Andersen to audit that year's statements. The fees paid back by the builders to EPIC at that time were 5% to 7% of the selling price. Arthur Andersen concluded that builders' fees could not be treated as income until realized by syndication to third parties of the limited partnership. The auditors so advised EPIC. At a meeting on April 15, 1980, between the auditors, Billman and others, Billman dismissed Arthur Andersen and advised that Jones would complete the audit for 1979.

In June 1982 officials of EPIC approached Price Waterhouse to become the corporate auditors. Price Waterhouse took the position that an RDC could be treated as income only to the extent that it offset direct costs incurred in the acquisition of the property. The balance of an RDC would

---

9. One result of the March 1983 merger of EPIC and the service company was to place both EPIC and CSL on a calendar year basis for financial statements.

have to be deferred until the house was sold because it was that event which demonstrated whether a profit had actually been made. James F. Chadbourne, III (Chadbourne) of Price Waterhouse testified that this proposed accounting change would have caused EPIC to report losses rather than profits and would have wiped out EPIC's net worth. Price Waterhouse was not hired. Chadbourne was later told by an EPIC official that Fox & Co. (Fox) had been engaged and that Fox did not have any problem with EPIC's accounting policies.

Fox prepared EPIC's financial statements for the year ending December 31, 1982, in which RDCs were treated consistently with the manner in which Jones had presented the financials. Fox audited CSL and EPIC for 1983 but changed the method of accounting for RDCs. Instead of recognizing income upon closing of the purchase from the selling builder, the fee income was deferred until the limited partnership participations were sold. On January 1, 1985, Fox combined with the national accounting firm, Alexander Grant (Grant), which audited CSL and EPIC for the year ending December 31, 1984.

The partner at Fox, and later at Grant, who directed these audits was Stephen Leser (Leser), a witness called by Billman. Leser had not established any significant reserve for bad debts on CSL's loans to, and accounts receivable from, EPIC partnerships and related entities. On direct examination Leser testified that he had assessed the reasonableness of the collectability of the advances by annually appreciating the EPIC product at rates which balanced with certain federally collected statistics for rates of appreciation on houses nationally for the years involved. On cross-examination Leser acknowledged that he also relied on the "client rep letter," in which the audited corporation's management represented to the auditors that all books and records had been made available to the auditors, that management had made adequate provisions for uncollectable accounts, and that there had been no event subsequent to the end of the audit year which would significantly affect

the financial condition of the company. In the course of his cross-examination Leser acknowledged that, as auditor, he had not been advised of the following:

—letters from DSL identifying regulatory violations concerning investment portfolio requirements;

—the reorganization of February 28, 1985, (in which Billman cashed out) that was reflected in three volumes of documents, including a consolidated financial statement presenting the effect of the reorganization as a $9 million negative net worth for EPIC Holdings;

—that various mortgage insurers had refused to insure, or to continue to insure, first mortgages on the EPIC product;

—that the Blue Book had been prepared and its destruction ordered; and

—that certain housing units had been classified A through D or that there was a negative significance for the "D" classification.

Leser agreed that he would have wanted to know these, and other facts not enumerated above, when evaluating the extent to which reserves should have been established for uncollectable accounts.

### D

Against the foregoing review of some of the relevant evidence, we address the unadmitted documents. Of these, we need only consider eleven, because in their brief to this Court respondents have attempted to demonstrate prejudice from only eleven of the documents. Inasmuch as prejudice is not presumed, it is incumbent upon the movant for a mistrial to persuade the reviewing court that the movant has probably been prejudiced. Using an erroneous standard of presumed prejudice, the Court of Special Appeals essentially rested its reversal on an enumeration of proposed, but unadmitted, exhibits identified by MDIF. Respondents have not attempted to explain how probable prejudice arose from many of the documents identified by the Court of Special Appeals.

Nor do we accept respondents' attempt to enlarge beyond their argument the number of unadmitted documents to be reviewed. Respondents say that "space limitations permitted a discussion of only representative documents." Respondents Brief at 42. This Court fairly assumes that experienced counsel, who were also respondents' counsel at trial, have selected those documents on which the strongest arguments of prejudice can be made. In any event, Maryland Rule 8–503(d) permits enlargement of the length of a brief with permission of this Court, but respondents did not seek permission to do so.

At oral argument, in response to a question from this Court as to what was the most prejudicial of the unadmitted documents, respondents pinpointed a copy of an article from *The Wall Street Journal* of September 5, 1985. It is headed, "Community S & L's Accounting for 1984 Stirs Wide Debate," and it is subheaded, "Booking of Certain Items As Profit Is Questioned By Several in Profession." The lead sentence reads: "Accounting practices that permitted [CSL] to shore up its profit and net worth for 1984 are the subject of intense debate in the accounting profession." The next three paragraphs give background which the jury had available to it in excruciatingly detailed evidence.

The next paragraph quotes an accounting professor in the business school at Dartmouth College as asserting that "[CSL] is using the most liberal accounting treatments available and playing the kind of games that have gotten many thrifts into trouble over the past few years." [10] After a balancing paragraph quoting the president of EPIC as saying that EPIC followed generally accepted accounting practices, the article went on to say:

---

10. *The Wall Street Journal* article was identified during MDIF's cross-examination of defense witness, Buckford Wallingford, an economist whose general thesis was that CSL's failure was caused by economic forces above and beyond the control of the defendants. The witness attended Dartmouth business school but did not know the professor who was quoted in the article.

"But Prof. Shank and other accountants believe that [EPIC] should have booked only as much as 25% of the $67 million in builders' loan origination and partnership organization fees that it credited totally to 1984 revenue. 'Basic accounting principles say that you can't take fees into profit until you have a bona fide arm's length buyer for the homes,' Prof. Shank maintained."

Assuming that the builders' loan origination fees referred to are the RDCs, the jury had already heard that accountants held differing opinions, with Jones at one end of the spectrum, with Arthur Andersen and Price Waterhouse maintaining another position, and with Fox/Grant having shifted position between 1982 and 1983.

*The Wall Street Journal* article then quoted an unidentified accountant at a major firm who viewed CSL's receivables as " 'very dubious.' " The jury had been inundated with evidence to that effect. The article then referred to the concern of regulators that accounting treatments in thrifts which were too conservative could sink the institutions. The article again quoted the professor (" '[M]ost of the rule makers and regulators seem to be convinced that the health of the nation and the economy requires such a charade.' "), referred to the engagement of Jones (who declined comment), quoted Grant's Washington, D.C. managing partner (" '[W]e feel we were right in issuing a clean opinion.' "), and referred to Arthur Andersen's declining, in 1979, to accept engagement from EPIC.

Respondents emphasize the lead sentence of the last paragraph in the article reading: "Denver-based Fox & Co., Inc., an accounting firm that had problems with federal regulators over several of its audits, became [EPIC's] auditor in 1982." The jury in the case before us had already heard that federal regulators had "problems" with Fox/Grant over the results of its audit of CSL. In considering CSL for insurance, the FHLBB examiners wiped from CSL's balance sheet $77.1 million in assets which Fox/Grant had, by their unqualified opinion, implicitly opined to be

reasonably collectable. There is no probable prejudice in *The Wall Street Journal* article.

Respondents assert that two of the unadmitted documents "were extremely prejudicial because they supported MDIF's claims that defendants had arranged inflated appraisals." Respondents Brief at 41. One document is a thirty-eight page listing of appraisers, arranged by states. The list was shown to Hewitt on cross-examination by respondents' counsel, but was not offered into evidence. Hewitt testified that he had seen lists of appraisers on which some of the names were marked "do not use." Hewitt knew one of the appraisers whose name was so, marked, telephoned him, and was told that the appraiser had not given EPIC what it wanted. Respondents' counsel showed Hewitt the entire list and developed that it contained 353 names, that only twenty-two names were crossed off, and that some of the notations read "slow," "limited" or "slow on volume deals." Cross-examination also developed that Hewitt had telephoned only one of the twenty-two persons whose names had been deleted. During Hewitt's cross respondents' counsel saw no outweighing prejudice in injecting the entire list into the case. That is not a basis for a mistrial.

The other document which is said to support MDIF's claims of inflated appraisals is a sheet of paper, one-half of which contained longhand notes with no identification of the author. The notes in part read:

"GE Mtg Ins—

1) Concerns—valuations—our property is over appraised

. . . .

* coverage would indemnify premium"

From the context, the first line necessarily is the abbreviation of "General Electric Mortgage Insurance." The jury had already repeatedly heard that private mortgage insurers were concerned that the partnership houses were over appraised.

Respondents also have cited an August 1, 1985, memorandum by Heath to his file, describing a meeting held on July 24, 1985, which was attended by officials of FHLBB, MDIF and CSL, including CSL's outside counsel. The memorandum records the points made by the examiners in explaining why their report would recommend against FSLIC insurance for CSL. All of those reasons were fully covered in the evidence. The trial court had refused to admit Heath's memorandum when it was offered on direct examination of an FHLBB examiner who had attended the meeting.[11] Respondents quote a sentence from the memorandum in which Heath considers it "apparent" from outside counsel's remarks that counsel and CSL " 'will attempt to convince Supervision/FHLBB officials that Community be allowed to continue the EPIC game with insurance of accounts.' " Respondents Brief at 38.

In referring on August 1, 1985, to the EPIC "game," Heath was encapsulating what the examiners had already discovered about the relationship of CSL to EPIC. In a June 21 memorandum to Heath from Hilliard, which is in evidence, Hilliard described the "game" more elegantly, as follows:

"Community/EPIC is a real estate syndication operation on a nationwide scale with over 300 tax shelter partnerships currently active involving probably one to two billion dollars. *Community's primary role in this operation is to provide funds to finance the operation.* The success of the partnership concept is predicated on appre-

---

11. McCuistion's counsel objected on the ground that the document was not contemporaneous with the meeting. The trial court did not agree. The trial court then focused on one sentence in which Heath says that CSL's outside counsel "made some asinine remarks about operating a 'vanilla association' so it could lose money." The trial court's view was that this type of "pejorative" comment was not appropriate to minutes of a meeting so that the memorandum was not a business record. We need not review that analysis of business record admissibility because respondents' claim of prejudice does not rest on the sentence in the memorandum singled out by the trial court.

ciation in the marketplace. In the past several years, residential rental property of the type securing these partnerships has not had a history of appreciation. The complexity of this organization continues to defy description. *However, it can unequivocally be stated that Community's primary function is to serve EPIC, rather than to provide savings/loans to a local market.* The risk in this type of operation is not in any way reasonable or appropriate for FSLIC to assume."

(Emphasis added). Heath's August 1, 1985, memorandum is cumulative.

Another of the documents which was not formally marked into evidence was a copy of an article entitled, *Creative Finance and the Review Appraiser,* reproduced from the fall 1981 issue of *Appraisal Review Journal,* published by the National Association of Review Appraisers. During MDIF's cross-examination of the defendants' real estate expert, Robert Stehm (Stehm), the witness was shown a copy of this article which was marked for identification. Without objection, MDIF's counsel read to Stehm a paragraph from the article quoting a savings and loan executive as saying that appraisals were currently being adjusted for builder concessions, that the adjustments are required by FHLBB regulations, and that the current frequency of creative financing should "cause lenders to request adjustments for financing terms on residential appraisals." The witness agreed that the paragraph was "exactly" what MDIF's real estate expert, Hewitt, had told the jury. MDIF's counsel then moved on to another point. Now respondents argue that their expert was contradicted by the last sentence of the article ("Review Appraisers should make adjustments for financing terms on residential appraisals the rule rather than the exception"). We find no substantial difference between Hewitt's testimony, the last sentence and the paragraph read to the jury, without objec-

tion, in the question to Stehm.[12]

Another unadmitted document which was also marked for identification on MDIF's cross-examination of Stehm, consists of certain pages from a book entitled, *Harrison's Illustrated Guide, How to Fill Out a Freddie Mac–Fannie Mae Residential Appraisal Report.* Again MDIF's counsel read a paragraph from the work while propounding a question to Stehm. That paragraph stated, *inter alia,* that builder concessions must be reported for the subject property and the comparables, and the value adjusted accordingly. McCuistion's counsel objected, and the objection was overruled, but MDIF's counsel did not pursue the line further.

Now respondents complain that a different portion of the document contradicted Stehm's testimony. One of the reproduced pages describes the income approach to valuation. In their case the defendants took the position that one of Hewitt's conclusions was that the income approach should have been used in valuing the EPIC product. This characterization of Hewitt's testimony was one with which the jury might, or might not, have agreed. Stehm testified that "[t]he income approach is not normally utilized in valuing a single-family home, because single-family homes are built in this country, substantially, for the most part, to be owner-occupied." He said that "[y]ou don't build 1,500 homes in a subdivision, and say 1496 are for owners, and four are for tenants." In *Harrison's Illustrated Guide,* the discussion of the income approach for valuing residential property is introduced by the following statement: "If the subject property is located in a neighborhood where rentals predominant and rental data is readily available together with sales, then this [income] approach to value should be used prior to final reconciliation." We find no prejudice. Indeed, to the extent that the jury thought that Hewitt had

---

**12.** Stehm disagreed with Hewitt that the RDC should reduce the market value of the houses because, in Stehm's words, "[t]hat's a business deal that's been established between—a business consideration between the buyer and the seller. Frankly I think it was a good business deal, but that doesn't affect the value...."

advocated across the board use of the income approach on the EPIC product, the material complained of in *Harrison's Illustrated Guide* benefitted the defendants.

Excerpts from the depositions of three individuals were also in the box found in the jury room. Maryland Rule 2–521(a) provides that "a deposition may not be taken into the jury room without the agreement of all parties and consent of the court." The purpose of the rule is to prevent a jury from giving undue weight to the testimony of a witness which is preserved in written form, as contrasted with testimony from live witnesses which jurors must ordinarily recall without the aid of a transcript.

One of the excerpts is from the deposition of a defendant, Barbara A. McKinney (McKinney). The excerpt consists of four and one-half pages from the deposition transcript, with twenty documents attached. The excerpt deals with an airplane race for female pilots and co-pilots held in June 1984 between termini in Georgia and the State of Washington. Billman's secretary, who owned the plane, and McKinney participated as pilot and co-pilot respectively. CSL was charged with the expenses of their participation. The documents attached to the deposition excerpt are copies of vouchers and other charges itemizing costs to CSL which totaled over $5,000. The basic facts set forth above were testified to by Elaine Dudash (Dudash), a vice president and member of the board of directors of CSL whose employment there antedated CSL's acquisition by Billman. Other copies of the exact same vouchers and charges were received into evidence under another premarked exhibit number during the direct examination of Dudash. The excerpts from McKinney's deposition were read to the jury in the course of Dudash's redirect. The description of the airplane race expenses was a very small part of the evidence of waste, which was part of the proof on count VI, claiming excessive compensation. Under these circumstances the error was not prejudicial.

The other two deposition excerpts were pre-marked as potential exhibits for the defendant Billman. One excerpt is from the deposition of Ejaner J. Johnson (Johnson) which was taken in this case. Johnson was chief of staff to the Governor of Maryland in 1985 and was active in the State's response to the Maryland savings and loan crisis. He was unavailable to testify at trial due to illness. The defendants sought to prove through the excerpts that the collapse of a private insurer of savings and loan accounts in Ohio in early 1985 had been caused by the run on a single association in that state and that, in Johnson's opinion, the crisis in Maryland similarly had been caused by the run on Old Court Savings & Loan Association. The circuit court would not accept Johnson as an expert on these broad issues of economic causation. Thus the defense case was actually benefitted by the availability to the jury of the Johnson deposition excerpts.

The parties are under the impression that the entire Johnson deposition was available to the jury. They have included all seventy-eight pages of deposition transcript in the 10,679 page joint record extract. The unadmitted document, which was identified as "Defendant's Exhibit Billman 958," however, is an excerpt of twenty-three pages, limited to Johnson's background and to the "causation" testimony.

Respondents assert that the Johnson deposition contains repeated references to the "Special Counsel" and the "Preston Report." The Special Counsel was a private attorney selected by the Governor and paid by the State who investigated, and rendered a factual report to the Governor on, the background of the savings and loan crisis in Maryland. In the background portion of the excerpt Johnson simply says that the only relevant document he still possesses is a copy of the Report of Special Counsel, known as the Preston Report.

In the same vein respondents also now complain of an excerpt from a deposition of E. Scott Moore, Esq. (Moore)

who from 1976 to 1979 had been a director of MSSIC.[13]
Respondents have no quarrel with the content of the Moore
excerpts, but they say that the title page reflects that the
deposition was taken by Special Counsel and the matter is
captioned, "In re: Special Counsel, Savings and Loan Inves-
tigation." Moore was not identified to the jury. He had no
connection with CSL. Nevertheless, respondents argue
that the jury might have inferred that Special Counsel's role
was to conduct a criminal investigation of CSL. That
argument is fanciful. It is also contrary to the evaluation
by defense counsel who sought to introduce the excerpt
from the Johnson deposition even though it does not ex-
pressly negate the possibility that Special Counsel was a
criminal prosecutor.

Another unadmitted document deemed prejudicial by re-
spondents is a civil action complaint by MDIF in another
action, *State v. Hogg*.[14] On the fifty-fifth trial day the
circuit court quashed a defense subpoena for a Deputy
Attorney General of Maryland who had been counsel for
MDIF in *Hogg*, an action brought by MDIF, as successor to
MSSIC, against former officers and directors of MSSIC.
The defendants in the instant action sought to show
through the subpoenaed witness that MDIF had taken the
position that the proximate cause of the collapse of CSL
was the failure of MSSIC to enforce its own regulations.
As part of that showing the present defendants intended to
introduce the first amended complaint filed in the *Hogg*
action. The trial judge refused to require the Deputy
Attorney General to appear. The first amended complaint
was then marked for identification, essentially as part of
the defendants' proffer. Respondents took no exception to,
and did not disassociate themselves from, the proffer.

---

**13.** This information is derived from the complaint by MDIF against
MSSIC directors, described *infra*.

**14.** An aspect of that action is reported in *State v. Hogg*, 311 Md. 446,
535 A.2d 923 (1988).

In their brief respondents select certain allegations in the *Hogg* complaint as demonstrating prejudice. For example, the complaint alleged "[CSL] aggressively pursued deposits which were used by its management to prop up EPIC's faltering tax shelter empire and to divert extraordinary amounts of fees to [CSL] Insiders." Despite that, and similar allegations, defense counsel sought to introduce the *Hogg* complaint because of other allegations. For example, it alleged that the breaches of fiduciary duty on the part of MSSIC's former officers and directors "were the proximate cause of losses and damage to MDIF, as successor in interest to MSSIC[.]" We find no prejudice, particularly since the allegedly prejudicial allegations were the subject of MDIF's proof in the instant matter.

The final unadmitted document which respondents select for argument was premarked as a potential plaintiffs' exhibit. It consists of three pages containing longhand notes, all of which appear to be in the same handwriting. From its content one might infer that the document was prepared in 1982. Page one itemizes four advances to "TJB" between September 1980 and April 1981. Pages two and three are a list of things "To Do" relating to one of the insider partnerships known as 100A. One of these tasks was to prepare an analysis on the assumption that there was, or would be, a sale on June 30, 1982, of all properties owned by 100A. Immediately below we reproduce the third page of the memo. All parties agree that the abbreviation "EA," for EPIC Associates, can be read as referring to the limited partnerships.

*# — Will this sole cause the liability MA has to Epic?*

*Point: JCJ does not believe some of these EA will ever be able to pay Epic back for advances.*

Respondents' sole point requires reading the three letter initials above as "TJB." That position is untenable, particularly when the letters are compared to the initials "TJB" as set forth on page one of the same document. MDIF submits that the initials are "JCJ" and refer to James C. Jones, the outside auditor. While that is a more reasonable reading of the initials themselves, we need not so decide. It is a sufficient disposition of respondents' contention that the letters are not "TJB."

For all of the foregoing reasons, we hold that the trial court did not abuse its discretion in denying respondents' motion for a mistrial. Nor is the denial of the motion a denial of due process as respondents argue. Consequently, this appeal must be remanded to the Court of Special Appeals for consideration of the other arguments raised by the respondents which were not addressed by the intermediate appellate court and which form no part of the issues raised in MDIF's petition for certiorari.

JUDGMENT OF THE COURT OF SPECIAL APPEALS VACATED. CASE REMANDED TO THAT COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS IN THIS COURT TO BE PAID BY TOM J. BILLMAN AND CRYSOPT CORPORATION. COSTS IN THE COURT OF SPECIAL APPEALS TO ABIDE THE RESULT.