636 A.2d 10

**Barbara A. McKINNEY**

v.

**STATE OF MARYLAND DEPOSIT INSURANCE FUND CORPORATION et al.**

**No. 1776, Sept. Term, 1992.**

Court of Special Appeals of Maryland.

Jan. 26, 1994.

Barbara A. (McKinney) Corvette, Alexandria, for appellant.

Timothy U. Sharpe (Neil J. Dilloff, Karen M. Valentine and Piper & Marbury, on the brief), Baltimore, for appellees.

Argued before WILNER, C.J., MOYLAN, J., and JAMES S. GETTY, Judge (retired), Specially Assigned.

WILNER, Chief Judge.

Appellant is upset with an order entered by the Circuit Court for Montgomery County, pursuant to Md. Rule 2–651, requiring her to deposit certain funds with the court if and when she receives them from the Clerk of the United States District Court. She believes that the court had no authority to enter such an order and asks us, therefore, to strike it. We find no impropriety in the order.

## Background

This case is a lingering consequence arising from the collapse of Community Savings & Loan, Inc. (Community) and, more particularly, from the shenanigans on the part of those who once were in control of Community. In addition to Federal criminal charges brought against some of those persons, including appellant and Tom Billman, both of whom were officers and directors of Community and some of its related entities, civil actions were instituted against them by appellee, Maryland Deposit Insurance Fund Corporation (MDIF), as receiver of Community, to recover losses incurred by virtue of alleged breaches of their duties of care and loyalty to Community. One of the claims in both the civil actions and in the Federal indictments was that Billman had managed to transfer $22 million in funds belonging to Community to Swiss bank accounts.

On October 6, 1988, after full trial in the Circuit Court for Montgomery County, judgments were entered in favor of MDIF against Billman for over $112 million, against Crysopt Corporation for over $94 million, and against appellant for over $101 million. The judgments against Billman and Crysopt were affirmed on appeal. *See State Deposit v. Billman,* 321 Md. 3, 580 A.2d 1044 (1990), *on remand,* 88 Md.App. 79, 593 A.2d 684, *cert. denied,* 325 Md. 94, 599 A.2d 447 (1991).

After the judgments were entered, and apparently during the pendency of the Federal criminal trial, Billman disappeared. He remained a fugitive until March, 1993, when he

was finally apprehended in France and extradited to the United States.

On December 23, 1988, appellant and MDIF entered into a Settlement Agreement in compromise and satisfaction of the judgment against her. In its recital clauses, the agreement noted that the judgment against appellant was for compensatory damages only and was not based on any claim of fraudulent conduct on her part, that appellant had incurred considerable expense in defending the action, and that her insurer, American Casualty Company of Reading, Pa., had refused to defend appellant, pay any part of the expenses incurred by her, or pay any part of the judgment. The agreement called for appellant to pay to MDIF $300,000, of which $75,000 was to be paid in cash within 30 days and the balance pursuant to a promissory note secured by a deed of trust on her Virginia home. It also required her to assign to MDIF all of her rights under the American Casualty policy.

Paragraph 3 of the agreement provided, in pertinent part, that "the judgment shall be satisfied in full as against [appellant] (assuming full compliance by [her] with all the terms and conditions of this Settlement Agreement)." Paragraph 11 stated:

> "MDIF and [Community] hereby covenant and agree not to look to any of [appellant's] future sources of income or funds to in any manner increase [appellant's] obligations hereunder or to in any manner amend or void this Settlement Agreement. Furthermore, MDIF and [Community] agree that in the event any other defendant in the Billman, Action, corporate or individual, agrees to pay some or all of [appellant's] attorneys' fees or some or all of the sums required under paragraph 1 of this Settlement Agreement, MDIF and [Community] will take all reasonable actions to permit such payments to be made and in the event that the same are made toward the amounts due pursuant to paragraph 1 of this Settlement Agreement, shall credit [appellant's] obligation hereunder therefor to the same extent as if [appellant] made such payments."

In ¶ 13, MDIF undertook to prosecute a claim against American Casualty to recover all covered losses that that company was obligated to pay on behalf of appellant. Appellant agreed to cooperate in the prosecution of that claim and also:

> "to cooperate reasonably with MDIF and [Community] . . . in MDIF's efforts to recover on its judgment in the Billman Action. If [appellant] fails to comply in good faith with this paragraph, MDIF and [Community] at their sole option may rescind this Settlement Agreement."

Paragraph 14 allowed MDIF to obtain "one sworn statement relating to [appellant's] assets or any other matter in connection with the collection of the Judgment against other defendants" and provided that if she "does not honestly and completely answer questions put to her, this Settlement Agreement shall be null and void." Finally, in ¶ 23, appellant consented to the jurisdiction of the Circuit Court for Montgomery County "for all purposes in connection with this Settlement Agreement."

MDIF had taken a deposition of appellant in aid of executing on its judgment on December 8, 1988—prior to entering into the settlement agreement; it never sought another sworn statement as provided for in ¶ 14. In that deposition, appellant stated that there was no one in the world keeping any asset for her, that apart from a claim against American Casualty for coverage, she was asserting no claim against anyone "that would bring moneys back to [her]," that, with the exception of a Crysopt account that she believed had been closed, she was not aware of any transfers of assets outside the United States by Billman, Crysopt, or any related entity, and that she was unaware of any asset of Billman that was not in either Maryland or Virginia. She acknowledged her continuing duty to cooperate.

Appellant paid the $75,000 and gave MDIF the note and other documents called for by the agreement, and so, on February 16, 1989, MDIF released its judgment against her in

the Virginia court in which it had been recorded.[1] Appellant paid the note in November, 1989; on December 11, 1990, MDIF released its lien on her home.

While all of this was transpiring, the Government was actively seeking to locate Billman and, as part of that effort, obtained a court order to tap appellant's telephone. The tap revealed frequent calls from Billman, a fact which appellant had acknowledged in her December, 1988 deposition. On May 9, 1989, appellant received an overseas call from Michael Byrd, a London solicitor retained by Billman, in which the two arranged for the wire transfer of funds from Billman to an account in the name of appellant's mother in Detroit, Michigan. In that conversation, both Byrd and appellant avoided referring to Billman by name, preferring to call him "a mutual client." On May 17, 1989, Billman, through Byrd, transferred nearly $500,000 to appellant via her mother's bank account.

On May 18, Billman called appellant to confirm the delivery of the money. In that conversation, they used code phrases and indirect references to confirm the delivery of the money and to plan a future contact at what they believed to be a "safe" line in Virginia. Billman inquired as follows: "It's my understanding that the eagle has flown and landed on your end. Is that correct?"—apparently referring to the wire transfer. Billman later referred to "normal tomorrow," to which appellant responded, "I think I understand the word normal," to which Billman stated, "Yeah, 703"—apparently referring to the "safe" line in Virginia.[2] Billman said he would call again the next day.

---

1. The only reference regarding this release is to a $33.7 million judgment recorded in the Circuit Court in Alexandria, Virginia. There is no reference in the brief or the record extract to the release of any other part of the $101 million judgment or to the release of any judgment recorded in a Maryland court. It does not appear to be disputed, however, that the full amount of the judgment was, in fact, released.

2. We may take judicial notice of the fact that 703 is the area code for northern Virginia.

On May 19, 1989, appellant's mother withdrew the funds from the account to which they had been wired and distributed them among other accounts and certificates of deposit in two Michigan banks. The same day, Billman called appellant again, as he had promised. During that conversation, it became evident that appellant had spoken with her parents, although it was not until the 20th that, in coded language, they confirmed that they had distributed the wired funds. Appellant and Billman, who obviously were romantically involved, spoke of possibly meeting in Canada; they discussed the possibility that their calls were being monitored:

"BILLMAN: ... Did you get the money?

MCKINNEY: [3] Yes.

BILLMAN: Good.

MCKINNEY: I got, I got word this morning.

BILLMAN: Good. Hope your mother didn't call you on an open line.

MCKINNEY: No. They didn't call at all. I called from someplace else.

. . . . .

BILLMAN: Well, the value of that, of that place is, is that there's absolutely no way they can pick anything up.

MCKINNEY: That's right.

BILLMAN: This one with a single line, who knows?

MCKINNEY: Yeah.

BILLMAN: And, ah, you know, I mean, I, I just don't know. It, the whole thing just scares the shit out of me. The phones, in fact, I mean, frankly, at some point I'm planning just to discontinue phone use."

Appellant also forwarded telephone messages for Billman that had been left on an answering machine. On May 20, officials intercepted a conversation between appellant and her parents regarding the transfer of the money sent by Billman from them to appellant.

---

3. Appellant's name was then McKinney.

On August 15, 1989, the Government instituted an action in U.S. District Court against appellant, contending that the transferred funds were subject to forfeiture under the Racketeer Influenced and Corrupt Organization Act (RICO), which Billman had been charged with violating. It was successful in obtaining from the court a temporary restraining order prohibiting appellant and her parents from disposing of the funds. In a subsequent proceeding on the Government's motion for an extended injunction and appellant's motion to vacate the temporary restraining order, the court considered two issues: whether the $500,000 in question could be traced to the proceeds of any RICO violation by Billman, and whether those funds continued to belong to Billman after the wire transfer. It answered both questions in the negative:

"As to the first question, the Court finds that the evidence simply fails to establish any direct link to the $22 million in RICO violation proceeds which Billman allegedly transferred to Swiss bank accounts in 1985 and 1986. . . . Given the fact that Billman appears to have had sources of income completely unrelated to his alleged criminal activities, the Court is unable to find that the proceeds of the May 17, 1989 transfer may be directly linked to his RICO violations, and thus frozen through [18 U.S.C. § ] 1963(c).

Moreover, the Court finds it unnecessary to determine whether Subsection (m) authorizes pre-trial injunctions as to substitute assets because the evidence of record fails to establish that respondent was merely holding funds which, in reality, still belonged to Billman."

As to the latter finding, the District Court noted that, from the tapped conversation, it appeared that Billman "was no longer claiming control over the transferred funds." It thus indicated that "[w]hether [appellant] had earned them in some way, or had simply received them from Billman as a gift, is completely irrelevant, since Subsection (m), at most, authorizes injunctions as to Billman's property." Upon these findings, the court denied the Government's motion for injunction and granted appellant's motion to dismiss the injunctive proceeding.

The Fourth Circuit Court of Appeals, upon the Government's appeal, expressed serious reservations as to the critical finding by the District Court that the Government had failed to show a tracing of the funds but nonetheless regarded itself as bound by that finding. *In re Billman,* 915 F.2d 916 (4th Cir.1990), *cert. denied,* 500 U.S. 952, 111 S.Ct. 2258, 114 L.Ed.2d 711 (1991). At 919–20, it stated:

"There can be no doubt that Billman was the source of the funds sent to [appellant] through his solicitor and through the Euro-plan transaction. The manner in which the funds were laundered, the use of codes and phones perceived to be safe, and the further laundering of the money for the Brickley settlement are facts that would justify the inference that the funds were part of the $22,000,000 deposited in Swiss banks. These facts would also justify the inference that the tainted funds were not Billman's to give away.

Nevertheless, the district court drew contrary inferences and we are bound by its findings. . . . Therefore, we are compelled to conclude for the purpose of this case that the source of the funds was money which Billman did not steal from Community."

Despite this compelled conclusion, the appellate court declared that the funds could be restrained under RICO—that the Government was not required to trace the proceeds of the RICO offense into a specific bank account in order to execute a forfeiture judgment but that such a judgment could be satisfied out of any of the defendant's assets, including "substitute assets" in the hands of a third party who did not qualify as a bona fide purchaser for value and without knowledge. Responding to appellant's claim that an indefinite restraint violated her right to due process, the Court pointed out that Billman's flight could not be attributed to the Government, but rather that appellant aided him by assisting in the transfer of Community's funds abroad and "presently sustains him as a fugitive by forwarding messages left for him on an answering device." *Id.* at 922.

In August, 1991, the District Court dismissed the RICO charge against one of Billman's co-defendants, Crysopt, on the ground that it failed properly to charge an enterprise or pattern of racketeering. Contending that the RICO count against Billman was equally defective, appellant, who in the meanwhile had been acquitted of the Federal charges against her, again sought the release of the transferred funds. In January, 1992, the District Court agreed with appellant that the RICO count against Billman was defective and that, as that charge was the sole basis for impounding the $500,000, she was entitled to the release of the money. Its actual ruling, insofar as revealed in the record extract before us, is best described by the Fourth Circuit Court of Appeals which, upon the Government's appeal, again reversed the District Court:

> "Subsequently, the district court held that the original indictment against Billman and another defendant, which served as probable cause to restrain the substitute assets, was defective. The government attempted to correct the flaws with a superseding indictment. The district court dismissed the superseding indictment as time-barred. It also dismissed the original indictment as to the other defendant, but not Billman."

*In Re: Assets of Tom J. Billman,* No. 92–1050, 1992 WL 237301 (Unpublished Opinion filed Sept. 25, 1992). The appellate court continued the restraint on two bases: (1) notwithstanding the apparent defect, the District Court had not, in fact, dismissed the RICO count against Billman, and (2) the superseding indictment was not time-barred, because the statute of limitations does not apply to fugitives. The Court therefore reinstated the restraint of the funds pending the result of Billman's criminal trial and forfeiture proceedings.

MDIF was not a party to any of these Federal proceedings, and indeed it appears that, under the RICO statute, it was not entitled to be a party. It was, however, obviously aware of the ongoing contact between appellant and Billman and the circumstances surrounding the transfer of funds, as revealed in the Federal proceedings, and it decided to go after those

funds in satisfaction of its unpaid judgments against Billman and Crysopt. In January, 1992, following the District Court's order that the funds be released to appellant and pending the Government's appeal to the Fourth Circuit Court of Appeals, MDIF, in the Billman and Crysopt cases, attempted to garnish the funds in the hands of the Clerk of the U.S. District Court in satisfaction of its judgments against Billman and Crysopt. The Clerk resisted the garnishment on a number of grounds, including sovereign immunity and the fact that the funds were in *custodia legis* and were not subject to attachment. Eventually, the matter was resolved by a stipulation that the writs of garnishment would not become effective until they were approved by the U.S. District Court and the Clerk was ordered by that court to comply with them.

Immediately upon the signing of that stipulation, MDIF (1) in the Billman case, filed a motion for ancillary relief in aid of enforcing its judgment pursuant to Md. Rule 2–651, and (2) filed a separate action against appellant in the Circuit Court for Montgomery County seeking an order rescinding the settlement agreement, reinstating the judgment against her, and setting aside the transfers from Billman. In that action, it charged her with breaching the settlement agreement, accepting a fraudulent conveyance from Billman, and converting funds belonging to Community.

The separate action against appellant has yet to be tried, and so the judgment originally obtained against her and later released has not yet been reinstated. What brings appellant here is an order entered in the Billman case in response to the motion for ancillary relief. In that motion, MDIF claimed an entitlement to the funds being held by the District Court on two grounds—as a judgment creditor of Billman and, with a rescission of the settlement agreement and reinstatement of the judgment against appellant, as a judgment creditor of her. After a hearing, the court, on July 31, 1992, entered an order that "[i]n the event that the Clerk of the United States District Court for the District of Maryland conveys to [appellant] all or any part of the funds that the Clerk is currently holding pursuant to the action [against Billman, appellant]

shall immediately deposit those funds into the registry of this Court" and that those funds would then be held by the Clerk of the Montgomery County Circuit Court "until a further ruling by this Court as to the disposition of the funds."

## *Discussion*

In this appeal, appellant raises five questions:

"1. Whether the Circuit Court committed reversible error by issuing an Order attaching appellant's assets in the absence of any outstanding judgment against appellant.

2. Whether the Circuit Court committed reversible error by issuing an Order attaching appellant's assets in enforcement of an outstanding judgment against others.

3. Whether the Circuit Court committed reversible error by issuing an Order attaching appellant's assets on the basis of unsupported and unadjudicated allegations by appellee.

4. Whether the Circuit Court committed reversible error by refusing to be bound by prior, valid Federal Court rulings as to appellant's ownership of the assets and the source of those assets, in issuing an order attaching appellant's assets.

5. Whether the Circuit Court committed reversible error by issuing an Order attaching appellant's assets for the purpose of a later determination by the Circuit Court of rights in those assets, where a United States District Court had prior custody and jurisdiction over the assets and all claims thereto."

Md. Rule 2–651 provides, in relevant part, that:

"Upon motion and proof of service, a court in which a judgment has been entered or recorded may order such relief regarding property subject to enforcement of the judgment as may be deemed necessary and appropriate to aid enforcement of the judgment pursuant to these rules, including an order ... to any person enjoining the destruction, alteration, transfer, removal, conveyance, assignment, or other disposition of such property...."

It is important to note that we are *not* deciding here the ultimate fate of the disputed funds, which remain for the present subject to the control of the District Court, or which of these two parties may eventually be entitled to them. That is a matter that may be resolved by the District Court and, if not, by the Circuit Court for Montgomery County. All we are deciding today is whether the order entered by the circuit court pursuant to Md. Rule 2–651 was validly issued.

For the order to be valid under the Rule, a court must find that there was a judgment entered in that court and that the property at issue is subject to enforcement of that judgment. In this case, where the property consists of funds presently being held in the registry of the Federal District Court and where the order requires appellant to deposit the funds with the registry of the Montgomery County Circuit Court if and when she receives them, all MDIF must show is a substantial likelihood that it would ultimately be entitled to the funds in satisfaction of a judgment it holds against either appellant or another, namely, Billman.

Because it is not clear on what basis the circuit court granted the motion, we shall consider both theories under which MDIF sought the order.

### Judgment Against Appellant

As we indicated, upon execution of the Settlement Agreement, MDIF formally released the $101 million judgment it held against appellant. At present, therefore, it has no judgment of record outstanding against her. MDIF's claim is that, by reason of her breach of the agreement, it is entitled to have the released judgment reinstated and to have the funds impounded in aid of enforcing that reinstated judgment. The problem with this theory is that MDIF has put the cart before the horse. The Rule requires, as a prerequisite, that a judgment have been entered or recorded to which the property in question is subject, and that is not presently the case. There is no subsisting judgment against appellant, entered or recorded, to which the funds are subject. Until such time as

MDIF succeeds in having the judgment reinstated, it cannot invoke the Rule based on a judgment against appellant.

## Judgment Against Billman

That there is presently an unpaid judgment against Billman in the Circuit Court for Montgomery County is undisputed. The question is whether these funds, which have been transferred to appellant through her parents by Billman, could be subject to enforcement of that judgment. If so, that would be a legitimate alternative basis for entry of the Rule 2–651 order.

Appellant makes essentially three points. First, she argues that the Rule does not permit the impoundment of funds belonging to one person (her) in aid of executing a judgment against another person (Billman). As the proposition is put, it is correct. The Rule does not purport to subject the property of one person to a judgment entered against another person. It operates only as to property that is "subject to enforcement of the judgment." The Rule was derived, in part, from former Md. Rule 628d., which allowed a court to "pass such order as will subject the property or credits *of the judgment debtor* either in his own hands or in the hands of any person to the operation of the judgment." (Emphasis added.) We think the current language means essentially the same thing.

The issue, however, is not the proposition as put. It is to be expected that, whenever property of a judgment debtor is found in the possession of another person, that person may make some claim to it in opposition to the title of the judgment debtor. The issue is whether, when such a claim is made, the court is authorized to immobilize the property by some appropriate means until the dispute as to title is resolved. If not, the Rule would be hollow indeed, for by the time the dispute is resolved, the property may be long gone. The Rule, we think, needs to be read in a common sense manner. So long as the person holding the property and making claim to it has proper notice and the opportunity for a

hearing and so long as the judgment creditor makes a reasonable, *prima facie* showing that the property is or may be subject to the judgment, the court may afford what is essentially an interlocutory form of relief. The relief is limited to that "necessary and appropriate to aid enforcement of the judgment," which would include the specific kinds of relief enumerated in the Rule and, if "necessary and appropriate," an order to deposit liquid, mobile funds into the registry of the court.

A second argument is that MDIF and the State courts are bound by the factual finding of the U.S. District Court that the funds in question did not come from Community and that they belonged to her and not to Billman. Although recognizing that MDIF was not a party to the Federal proceedings, and not contesting that MDIF could not legally have become a party to them, appellant seeks in her initial brief to bind MDIF on the theory that it was in privity with Billman and appellant, who were parties. In her reply brief, she asserts that MDIF is bound on the additional ground that it was in privity with the Government—that it was "so far represented by the U.S. Attorney's office that its interest received actual and effective protection."

We reject those arguments for two reasons. First, and foremost, they were not raised in the circuit court as a defense to the motion and cannot, under Md. Rule 8–131, be raised for the first time on appeal. Appellant defended against the motion below on three grounds—that no judgment existed against her, that MDIF had not established its entitlement to the funds, and that, until the Federal proceeding, then pending in the Fourth Circuit Court of Appeals, was concluded and MDIF *did* establish its right to the funds, the motion was premature. She did not present to the court a defense based on *res judicata* or collateral estoppel.

Apart from non-preservation, the fact is that MDIF was not in privity with Billman, appellant, or the Government, and certainly could not depend on them to assert a basis for entitling MDIF to the funds. Appellant's interest in the

Federal litigation was directly contrary to that of MDIF. We don't really know what Billman's position was, as he did not assert one, but we can hardly imagine that it would be in harmony with MDIF. Appellant's position was that the transfer was in payment of a lawful obligation to appellant, that it was not fraudulent, and that it did not come from funds purloined from Community. MDIF, of course, asserts the opposite.

The Government's position was more harmonious with that of MDIF, but it was not identical. If MDIF can show that appellant's conduct constitutes a breach of the settlement agreement, either as a violation of her duty to cooperate in satisfying MDIF"s judgment against Billman or as establishing the falsity of her representation that no one owed her any money and that she had no claim against anyone other than American Casualty, it would be entitled to have the judgment against her reinstated, and, at *that* point, would be entitled to invoke Rule 2–651 based on that judgment. The Government had no interest in establishing a predicate for that position. Its claim was based solely on an alleged violation of RICO by Billman.

Because it was neither a party to the Federal proceeding nor in privity with such a party, MDIF is not bound by the findings of the District Court. Indeed, given the doubt cast on them by the Fourth Circuit Court of Appeals, it may possibly succeed in convincing a State judge or jury that the District Court was wrong and that the $500,000 did, in fact, come from funds properly belonging to Community or, alternatively, that, even if they came from other assets of Billman, the transfer was fraudulent and that MDIF has a superior claim to them.

The third principal argument made by appellant is, in essence, one of prematurity. She urges that until such time as the District Court releases the funds and MDIF proves its entitlement to them, the court has no authority to impound the funds. The first prong of this argument captures the arguments posited by the District Court Clerk in the garnishment

proceeding—that the order interferes with the Federal custody of the funds. That is simply not the case. The order, especially when coupled with the stipulation entered in the garnishment proceeding, in no way interferes with the Federal court's control over the funds. It operates only upon appellant and only upon the release of the funds to her.

The second prong is also unavailing, for the reasons already noted. The Rule does not require that MDIF first prove its entitlement to the funds. So long as MDIF was able to make a reasonable showing that the $500,000 came from Billman, which is undisputed, and that MDIF, as a judgment creditor, may have a higher claim to it than does appellant, the court is authorized to preserve the funds until that issue can be tried. MDIF has asserted a right to the funds on several grounds, including that the funds did come from Community, that they were not lawfully Billman's to transfer to appellant, and that the transfer constituted a fraudulent conveyance of Billman's assets, and it offered some evidence in support of those grounds.

The order at issue here is not a decision on the merits of who is entitled to the funds. It is not an attempt to attach indirectly what could not be attached directly, i.e., property in the registry of another court. All the order requires is that, if and when released to appellant by the Federal court, the funds be preserved in the registry of the circuit court until the question of who has the greater entitlement to them is resolved.

ORDER AFFIRMED; APPELLANT TO PAY THE COSTS.